# MILLER v. STUART et al.

No. 4417. Decided February 5, 1927. 253 P. 900.

*Clark, Richards & Bowen,* of Salt Lake City, and *Young & Bullen,* of Logan, for appellant.

*Fisher Harris,* of Salt Lake City, for respondent.

CHERRY, J.

This is an action on a negotiable promissory note for $1,000, dated September 12, 1924, executed by defendant Stuart and payable to his own order six months after date. It was indorsed by defendant and delivered to E. J. Welch and C. A. Quigley, who thereafter and before maturity of the note for value, indorsed and delivered it to the plaintiff. The note was also indorsed at the time of transfer by the Pahvant Coal Company and O. W. Ewing. The defendant Stewart pleaded that the execution of the note was obtained by fraud, and that the note was void in law, because it was part of a transaction for the sale of corporate securities in violation of the "Blue Sky Law," and that the plaintiff, before taking the note, knew of said defenses, or knew of such facts that it was his duty, acting in good faith, to make inquiry of the same. The case was tried before a jury, but, when the evidence on both sides had been submitted, the court, on motion of the plaintiff, directed a verdict for the plaintiff, which was accordingly returned, and from the judgment entered thereon defendant Stuart has appealed.

The appeal presents two main questions: (1) Did the defendant produce evidence sufficient to show defective title to the note by those who indorsed the same to plaintiff: and (2) if so, was the evidence relating to the plaintiff's acquisition of the note sufficient to establish the plaintiff

as a bona fide holder in due course, as a matter of law, and thus warrant the court in directing a verdict notwithstanding the defective title of plaintiff's indorser? With respect to the first question, defendant asserts that the execution of the note was obtained by fraud, and, in addition, was in violation of the Blue Sky Law, and therefore void under the statute, even in the hands of a holder in due course.

In support of his claim of fraud the defendant offered proof that one Joseph S. Welch, who purported to represent the Pahvant Coal Company, stated that the company needed financing, and proposed to defendant that, if he would lend his credit for a year, he would get a $1,000 bond, and a bonus of $1,000 stock, and that, if he paid for and kept the bond, he would get an additional bonus of $1,000 in stock. He represented that the company had an authorized bond issue of $600,000 in a certain trust company; that the company would be shipping coal from its mine in 30 days; that its land was fully paid for; and that the mine was then being worked. He further stated that the bonds subscribed for were in possession of the trust company and would take care of the note, and that defendant would never have to pay a dollar. Defendant thereupon signed and delivered a written subscription to the Pahvant Coal Company for $1,000 of its bonds, upon the terms that the bonds would be deposited as collateral security for the payment of the subscription, and, in case of nonpayment, the bonds should be sold and the proceeds applied in full payment thereof, and, in case of payment of the subscription, the subscriber would be entitled to a stock bonus of $1,000. In addition thereto, the defendant executed a promissory note for $1,000, payable to the order of himself six months after date, indorsed it on the back, and delivered it to Welch. At the same time he signed and delivered a financial statement indicating his net worth to be about $40,000. About two months later Welch returned to defendant, and stated that the company and the stockholders had got together and decided it would be better to give a new contract and note.

He presented for defendant's signature the note here sued upon and an agreement as follows:

"I, the undersigned, have this day loaned to Quigley and Welch $1,000, and it is understood and agreed that, for and in consideration of this loan, I am to have issued to me one share of stock of the Pahvant Coal Company, par value $1 per share of stock, as a bonus for each dollar loaned.

"Said Quigley and Welch also agree that this subscription carries with it the right to buy coal from them at wholesale prices as long as they are stockholders in the Pahvant Coal Company. Coal deliveries will be made as soon as Pahvant Coal Company's mine is in operation. In the meantime coal deliveries will be made at the lowest possible price attained by Quigley and Welch.

"It is also understood and agreed that the amount of this loan is to be paid by said Quigley and Welch on or before one year from date."

Defendant remarked that the proposed agreement was with Quigley and Welch, instead of the coal company. Welch told him "that is just the same" as Quigley was president and Welch vice president of the company, and said that "all the rest of the boys had signed"; that the company would take care of the note; that defendant need not worry as he would never have to pay a dollar; that the execution of the new note would save the company two months' interest, and that his obligation would not be changed from the former agreement; that the bonds were in the trust company, and would take care of the note. Welch returned the subscription agreement to defendant, and promised to later return the note previously signed, but failed to do so. The defendant thereupon executed and delivered the agreement above quoted and the promissory note sued upon. Defendant testified that he loaned his credit by subscribing for the bond and giving his note; that he relied upon Welch's statement that the company would take care of the note and pay it, and would not try to make him pay it. Defendant admitted that $1,000 in stock of the coal company had been delivered to him.

Proof was offered to show that only $191,500 of the 600,-000 bond issue was in the hands of the trustee when the

notes in question were executed; that during April or May, 1925, $1,000 in bonds were deposited in trust for defendant by Quigley and Welch; that in September or October, 1925, the trustee mailed the same to defendant, who refused to accept them, but returned them. In contradiction of Welch's statement that "all the rest of the boys had signed" the new agreements and notes, it was shown that three other men in the locality had signed similar agreements and notes a few days after defendant had signed.

The only representations of fact claimed to be false were the statements that $600,000 in bonds were in the hands of the trustee and that "all the rest of the boys" had signed the agreements and notes. As defendant could have no possible interest in more than $1,000 of the bonds, it is not seen how the overstatement of the amount of bonds held by the trustee could affect him, and nothing appears which indicates that the indefinite statement that "all the boys had signed" had any influence or effect upon the transaction. We think the evidence fails to establish any legal fraud in the matter.

The evidence plainly shows that defendant executed and delivered the note for the purpose of lending his credit to the coal company or Quigley and Welch, relying upon their promise to pay the note. Defendant, in his answer, averred that it was represented to him, among other things, that the note "was merely an accommodation and convenience to said Pahvant Coal Company." That is the essence of the matter, and the defendant testified, in effect, that he so understood it. In such case the relation of defendant to the note was that of an accommodation party, who is defined and whose liability is fixed by the negotiable Instruments Law (Comp. Laws Utah 1917, §4058) as follows:

"An accommodation party is one who has signed the instrument as maker, drawer, acceptor, or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party."

Numerous cases illustrating the application of the above section are cited and quoted from in Brannan's Neg. Inst. Law (4th Ed.) at pages 269-272. We cite the following as cases where the accommodation party was held under circumstances similar to those of the case at bar: *Forbes* v. *Ft. Lauderdale M. Co.,* 83 Fla. 66, 90 So. 821; *Gerli* v. *Nat. M. S. Co.,* 78 N. J. Law, 1, 73 A. 252; *First Nat. Bank* v. *Allen,* 141 Ark. 328, 216 S. W. 1039; *Black* v. *Bank, etc.,* 96 Md. 399, 54 A. 88; *Neal* v. *Wilson,* 213 Mass. 336, 100 N. E. 544; *Chase* v. *Du Pont Nat. Bank* (C. C. A.) 277 F. 235; *Talmadge* v. *Millikin,* 119 Ala. 40, 24 So. 843; *Bank of Cal.* v. *Starrett,* 110 Wash. 231, 188 P. 410, 9 A. L. R. 177.

The next question to be considered is whether the title of plaintiff's indorsers to the note was defective by reason of the transaction being in violation of chapter 17, Laws Utah Special Session 1919, then in force, known as the Blue Sky Law. The provisions of that act, so far as relevant to the present inquiry, are that no investment company shall sell or exchange its securities without first registering with the securities commission and making applicaton for and receiving a license authorizing the same. It provides the form and contents of the application, requiring, among other things, that the names of agents authorized to solicit purchasers of stock be set forth (section 4), and provides that, upon compliance with the act, the commission may, if deemed advisable, issue "a license under the seal of said commission and signed by the secretary thereof, in such form or forms as the commission shall adopt, which said license shall be valid for a period of one year from date of issuance unless sooner revoked by said commission for good cause upon notice to such investment company and a hearing duly had" (section 6). In addition to other fees, a fee of $5 is required to be paid "for the registration and authorization of each agent of such investment company or dealer, which fee and registration shall entitle each agent to act as such until the 1st day of May, following, unless said authority is sooner

revoked. Each of such agents shall make a new registration on May 1st of each year for the renewal of their agency, and the commission shall charge and collect for each such renewal a registration fee of $5.00." Section 7. This is the only provision in the act relating to the authority of such agents. No other prohibitions or penalties concerning the acts of agents are contained in the act, except the general provision of section 23, which makes guilty of a felony any person who advertises or sells "securities as herein defined without first making application to the commission and receiving the license herein required * * * or does any other act or thing in violation of the terms of this chapter," and section 24 providing, "any contract of sale made in violation of the terms of this chapter or without first applying for and receiving the license as herein required shall be unlawful and void," and subjecting all persons concerned therewith to liability to the purchaser, in a civil action, for the purchase price paid and all damages, etc.

The evidence produced on this subject was to the effect that the Pahvant Coal Company made application to the securities commission for a license to sell its bonds, and in connection therewith to give stock as a bonus to purchasers, in which Jos. S. Welch was designated as a "fiscal agent" of the company. A copy of a letter from the secretary of the commission to the coal company was introduced in evidence, which letter specified in considerable detail the particular manner and terms upon which its securities were to be sold and to which the coal company was required to agree as a condition upon which the license would be issued. The letter, among other requirements not material here, prescribed and required that—

"If the bonds were sold on the partial payment plan and notes taken for the payment of the same, the contract and note should be one and the bond shall be full collateral for any unpaid balance upon any note taken as part payment for said bonds."

There was proof that a license was thereafter, and on June 4, 1924, issued to the coal company, but the license itself, or a copy thereof, was not produced, nor its contents shown. It was further proved that the records of the commission failed to show that Jos. S. Welch had been licensed as an agent. Whether or not the company had paid a fee of $5 for his registration and authorization did not appear.

The contention of appellant is that the dealings between Welch and the defendant constituted but one transaction; that the taking of an unconditional note in connection with the subscription to the bond on the occasion of the first arrangement violated the terms upon which the license was issued, because the company, by the letter from the commission, was prohibited in such case from taking a note upon which the maker was personally liable. It is contended that the second transaction, wherein the note sued on was executed, was a mere substitution of the first, and an effort to change the form of the first in order to evade the Blue Sky Law. The transaction is challenged on the further ground that it was made by Jos. S. Welch, as agent, who was never licensed to dispose of securities of the coal company.

In view of the severe penalties and serious consequences imposed by the act for its violation, a particular transaction ought not to be and will not be held in violation thereof, unless it clearly and satisfactorily appears to contravene the spirit and letter of the law. Penalties and forfeitures will not be implied or adjudged on doubtful grounds. The statute, being penal, is to be strictly construed, and not extended by implication. *Somers* v. *Commercial Finance Corp.*, 245 Mass. 286, 139 N. E. 837. The act confers upon the securities commission the power and authority to issue licenses for the sale or exchange of certain corporate securities. There is no provision in the act which grants the power to regulate the terms or conditions upon which such sale may be made. Granting that the proposed price or terms of sale might properly be considered by the commission upon the question of the propriety of issuing a license, we cannot give

assent to the proposition that a sale made in violation of some representation or promise made in order to secure a license is, for that reason, an unlicensed sale, so long as the license itself stands unrevoked. It may be grounds for revocation of the license, but it is not a sale made without a license. In the case at bar a license was in fact issued and was in force at the times in question. This we think was sufficient to prevent the transaction being avoided on the ground that the sale of the bond was unlicensed.

With respect to the claim that the transaction was illegal because Welch the agent who conducted it was unlicensed, there is no express requirement in the law that agents must be licensed; nor is there any prohibition against or penalty provided for the making of a sale by an unlicensed agent. The act merely provides that there shall be charged and collected a fee of $5 for the registration and authorization of each agent, which fee and registration shall entitle each agent to act as such until the 1st day of May, following, unless said authority is sooner revoked. There is no provision at all for the issuance of a license to an agent, and no prohibition against an agent acting without being registered. Although there is proof in the record tending to show that Welch was reported to the commission as an agent of the coal company when it applied for its license, we think without that proof there would be no warrant of law for declaring a contract illegal or void because it was made by an unregistered agent, if the sale of the security sold was licensed. The act (section 24) provides that—

"Any contract of sale made in violation of the terms of this chapter or without first applying for and receiving the license herein required shall be unlawful and void."

We are unable to say that the contract in question was made in violation of any term or requirement of the chapter, and, as before seen, it was not made without a license. This conclusion is at variance with what was said upon the subject in *National Bank of the Republic* v. *Price,* 65 Utah, 57,

234 P. 231, where we think this court fell into error. That case, as far as it conflicts with the conclusion here reached, must be and is overruled.

It follows that the defendant failed to show that the title of plaintiff's indorsers to the note was defective, and that conclusion makes it unnecessary to consider the question of the sufficiency of the evidence to establish the plaintiff as a holder in due course, etc. That the plaintiff was a holder, for value, cannot, under the evidence, be doubted.

An additional question arises concerning attorney's fees. The note contained a stipulation for the payment of a reasonable attorney fee in case the note was not paid at maturity. The plaintiff claimed $150, and offered one witness who testified that $200 was a reasonable amount. There was no other evidence on the subject. When the court directed the verdict, he directed that $150 be included for attorney's fee. This was a formal error, because a general denial in defendant's answer put in issue the amount of the attorney's fee claimed. But from the circumstances of the case it is plain that there was no substantial controversy on this subject. Had the particular matter been called to the attention of the trial judge at the time, he doubtless, would have submitted that question to the jury. But it was not. Under the circumstances we think the error harmless and immaterial, as the jury, under the evidence, must have arrived at the same result, had the matter been submitted to them.

Judgment affirmed.

THURMAN, C. J., and STRAUP, J., concur.

Term of office of Hon. Valentine GIDEON, who was Chief Justice, expired before rendition of this decision.

FRICK, J., absent at time of rendition on account of illness.