PEOPLE v. MONTAGUE.

1. LICENSES—BLUE SKY LAW—PURPOSE OF ACT.
    Purpose of the blue sky law is to prevent fraud, deception and imposition on purchasers of securities and the law should be liberally construed (2 Comp. Laws 1929, §§ 9771, 9773, as amended by Act No. 37, Pub. Acts 1935).

2. SAME—PUBLIC OFFERING—PRIVATE SALE—EACH CASE DECIDED ON OWN FACTS.
    Whether securities are issued for purpose of being offered for sale to the public and seller is required to have a license under the blue sky law for so doing or whether the offering is private must be decided in each case upon its own particular set of facts, there being no distinction determinable by arithmetical

calculation or by language of negation in a prospectus or circular letter (2 Comp. Laws 1929, § 9769 *et seq.*, as last amended by Act No. 37, Pub. Acts 1935).

3. SAME—SECURITIES—PUBLIC OFFERING—PRIVATE SALE.

In prosecution for sale of securities without license having been secured from the securities commission to do so, fact that offer to sell such securities was made to parties selected from a list of stockholders of a corporation *held,* not to make such sales private ones and to permit finding an offering to the public especially where it is disclosed sales would be made in exchange for securities of other corporations as well as to anyone who might become interested (2 Comp. Laws 1929, § 9769 *et seq.*, as last amended by Act No. 37, Pub. Acts 1935).

4. SAME—CONSTRUCTION OF BLUE SKY LAW.

Blue sky law should not be rendered impotent by a narrow interpretation of its language (2 Comp. Laws 1929, § 9769 *et seq.*, as last amended by Act No. 37, Pub. Acts 1935).

5. EVIDENCE—JUDICIAL NOTICE—ADVERTISING.

Supreme Court takes judicial notice of the widespread use of the mail for advertising.

6. LICENSES—BLUE SKY LAW—PERSONAL LETTERS—ADVERTISING.

Use of some 240 personal letters, wide circulation of a prospectus and personal display and distribution of literature in the solicitation and furtherance of the sale of stock of a proposed corporation *held,* advertising within meaning of proviso of section of blue sky law so as to render the offering one to the public (2 Comp. Laws 1929, § 9773, as last amended by Act No. 37, Pub. Acts 1935).

FEAD, C. J., and WIEST, J., dissenting in part.

Appeal from Emmet; Sprague (Victor D.), J. Submitted April 15, 1937. (Docket No. 146, Calendar No. 39,176.) Decided June 29, 1937.

Herbert Montague and C. A. Forshee were convicted of a violation of the blue sky law. Affirmed.

*Leon W. Miller* and *John M. Dunham,* for appellants.

*Raymond W. Starr,* Attorney General, and *Clyde Comstock,* Prosecuting Attorney, for the people.

BUSHNELL, J. Defendants were convicted of a violation of sections 21 and 22 of the blue sky law, being a part of Act No. 220, Pub. Acts 1923, as amended (2 Comp. Laws 1929, § 9769, *et seq.,* as last amended by Act No. 37, Pub. Acts 1935). A trial by jury was expressly waived by each defendant.

Appellants were charged with unlawfully dealing in securities at the city of Petoskey, in the county of Emmet, without first procuring a license therefor as provided in the act.

We quote the following statement of facts from the opinion of the trial judge:

"The facts are not greatly in dispute. Having obtained from sources undisclosed by the testimony a partial list of the stockholders of the Petoskey Portland Cement Company and the Petoskey Transportation Company, defendants wrote three letters to some 80 of them located in Emmet and various other counties of the State. The exact form of the first letter does not appear though its date, April 7, 1936, and contents, at least in part, appear in Exhibit 5. The two follow-up letters bear date April 11 and April 17, 1936. The letters were written on the stationery of 'Industries Trust & Finance Company, Book Building, Detroit.' They were signed: 'C. S. Forshee Industries Trust & Finance Co., C. S. Forshee, Trustee,' the name of C. S. Forshee being written in with pen and ink where it first appears, the balance of the signature being typewritten.

"The letter of April 11th, exhibit 5, says:

" 'In our letter of April 7th we stated that we were preparing a prospectus outlining our plans for the immediate future. We are inclosing a copy herewith.'

"The letter of April 17th, exhibit 7, says: 'We have continued our examination of several companies

that are seeking the services that we are preparing to give. We have already entered into a contract with one company that has the most promising future that we have ever seen. * * * Mr. Montague, trustee and attorney in fact, or the writer will be in your vicinity in the near future and if agreeable to you will call upon you with all the papers and information necessary to give you a true conception of our company and its activities now, as well as those planned for the future from every angle.'

"The prospectus, exhibit 1, bears the heading: 'Aims and purposes of the proposed Industries Trust & Finance Corporation (To be incorporated under the laws of the State of Michigan).'

"An appreciation of the paper can only be had by a reading of it. Briefly, after referring to the depression and resulting crippling of industries and their need for financial help, it states:

" 'It is with this in mind that the Industries Trust & Finance Corporation was conceived. It is with this in mind that it will be carried on by an organization composed of Michigan men known far and wide for their honesty, integrity and ability.'

"The prospectus then speaks of 'management,' 'operation of the proposed Industries Trust & Finance Corporation,' 'organization and financing of the proposed Industries Trust & Finance Corporation,' 'location,' and 'possible earnings.' Under the heading 'organization and financing of the proposed Industries Trust & Finance Corporation,' it states:

" 'The proposed corporation is to be incorporated under the laws of the State of Michigan with a capital of 50,000 shares of common stock, fully paid and nonassessable, and without par value. There is to be no preferred stock or bonded indebtedness, and no liability attached to stockholders.

" 'The corporation is to be composed of a very limited number of preorganization stockholders only. Not a single share of stock is to be sold after incorporation.

" 'A very unique plan of preorganization financing has been devised, whereby from 20 to 25 recommended persons will be invited to participate in the organization of the company. No general solicitation of the public will be made, and all members taken into the company will be issued stock certificates as soon as incorporation is completed.

" 'No cash will be accepted for stock.' * * *

"Defendants in the latter part of April came to Emmet county and interviewed stockholders of the Cement and Transportation companies. The plan as outlined by defendants on the witness stand was to trade stock of Industries Trust & Finance Corporation for stock of nondividend-paying companies. The offers to trade in Emmet county were on the basis of two shares of Industries Trust & Finance Corporation stock for one share of Cement Company stock and three shares of Industries Trust & Finance Corporation stock for one share of Transportation Company stock. No actual sales or trades of Industries Trust & Finance Corporation stock were made in Emmet county; many offers, solicitations and attempts to sell and trade that stock were made there by defendants during the time charged in the information. Two actual sales of Transportation Company stock, which had been secured by defendants in exchanges in other counties for Industries Trust & Finance Corporation stock, were made by defendant Montague but the charge against defendants, as narrowed by the bill of particulars, does not include these sales—the evidence of them was received as characterizing the acts of defendants in Emmet county.

"While most of the offers to trade Industries Trust & Finance Corporation stock were made for Cement Company and Transportation Company stock, defendants did not limit their offers to trade for the stock of those companies. Defendants were willing and offered to trade Industries Trust & Finance Corporation stock for marketable shares in any company—they were appealing to those of the general public holding nondividend-paying stocks. This offer and appeal was repeatedly made in many different counties in the State and 16 such trades were made. The acquired stocks were promptly sold by defendants. From shares so received and sold $1,500 was realized. At the time of the trial there was less than $50 of these funds unexpended.

"One of the sales or trades of Industries Trust & Finance Corporation stock for Petoskey Transportation Company stock, which was made in Charlevoix county, is shown by preorganization subscription agreement, exhibit 8, bearing date of April 29, 1936."

This subscription agreement appointed defendant Forshee and two other subscribers were appointed by him to be trustees and attorneys in fact to do all things necessary and expedient to carry out the purposes of the proposed corporation, including the signing of the original articles of association. The agreement contained a ratification and approval of all acts that the trustees and attorneys in fact might do in the premises.

Decision turns on whether the record shows a "public offering" of stock and whether it shows that subscriptions were "solicited by advertising."

The statute (2 Comp. Laws 1929, § 9773), as amended by Act No. 37, Pub. Acts 1935, reads:

"SEC. 5. And, except as hereinafter provided, the provisions of this act shall not apply to the sale of any security in any of the following transactions: * * *

"(f) Subscriptions to capital stock made by incorporators in a proposed Michigan corporation, not exceeding twenty-five in number: Provided, That no public offering is made nor subscriptions to such proposed corporation solicited by advertising or commissions received for such subscriptions and that such subscribers actually sign the articles of association in person and not by agent."

"The purpose of the act is to prevent fraud, deception and imposition on purchasers of securities," *Wickstrand* v. *Nelson,* 273 Mich. 393, and it "should be liberally construed." *Eichbauer* v. *United States Fidelity & Guaranty Co.,* 278 Mich. 674, 680, and 2

Comp. Laws 1929, § 9771, as amended by Act No. 37, Pub. Acts 1935.

Appellants argue that since the act permits the obtaining of subscriptions in a proposed corporation not to exceed 25 in number, it must necessarily contemplate the right to devise some plan to obtain these subscriptions; that the offerings of the defendants having been made privately by letter, were personal in their nature; that a public offering is one made to the general public under the terms of which anyone might subscribe; and that the offering to a selected list of names cannot be said to be public in a State with a population of more than five and one-half million people.

"The dividing line between securities which are issued for purpose of being offered for sale to the public and those which are not may not be readily discernible in every instance. Each case must be decided upon its own particular set of facts." *In re Leach,* 215 Cal. 536 (12 Pac. [2d] 3).

We quote the following from 22 California Law Review, 347 as illustrative of the meaning of sales to the public:

"By 'sales to the public' it is not meant that there need be offers or sales to all of the people but only that there be offers or sales to many of them as contradistinguished from a few. The court must decide whether there has been such a sale or offer upon the facts presented in each case. This would protect the constitutional right of the *bona fide* owner to dispose of his property without regulation except where it would be adverse to the best interests of the community, *i. e.,* where he endeavors to dispose of them by sales *to the public.* This would, of course, impose the burden on the court of determining in each case whether there was such a sale, but the Cali-

fornia court has recently said that the phrase 'to the public' as used in certain parts of the securities act was 'reasonably plain and free from any serious ambiguity.' (*In re Leach,* 215 Cal. 536, 545, (12 Pac. [2d] 3, 7).

"There is no logical reason to differentiate the seller of securities from the seller of fruit or meat. In either case it is the duty of the seller to determine for himself whether he is selling to the public or only making a private sale. In both cases the purpose of the regulation is to protect the public from dangerous products and in both the burden of determining whether he comes under the act is not unjustly placed on the seller."

The distinction between a public and a private offering cannot be determined by arithmetical calculation, nor can it be controlled by language of negation in a prospectus or circular letter. No hard and fast rule can be laid down by which the limits between a private and a public offering may be ascertained in every instance. In this field of the law as in others, each situation must be determined by its own particular set of facts. See *In re Leach, supra.*

In this instance, the defendants, as indicated by their representations and the prospectus, were concerned with the promotion of an idea within the pale of the law, but without securing a license from the securities commission. An offer to sell to parties selected from a list of stockholders of a corporation is no more a private offering than if names had been selected from a city or telephone directory, or taken from a list supplied by those in the business of selling such information.

Forshee testified as follows:

"As to how it happened that we picked out the stockholders of the Petoskey Portland Cement Com-

pany, that was due to the fact, I believe, that Mr. Montague had in his possession a stockholders list, an old list. As to whether we discussed our plan or prospectus, so to speak, and decided that we should pick out a particular company which possibly was not paying dividends upon its stock and that we decided by this plan or course of procedure that it would be much easier to convince or influence these people to turn their stock over, that is not the idea we had in mind originally. While it is true that we used that list, but it was not the intention to deal entirely in Petoskey Portland Cement Company stock. As a matter of fact, we found that many of these people held stock of different kinds and our plan was to have them submit a list of their holdings and we would endeavor to find a market for them. It would be natural that our main thought would be to organize this company in the easiest possible way, and to finance it the same way. We proposed to get the lists of their holdings and then market their stock, try and find a market for it. They were all asked that question, if they had any stocks or bonds that were lying dormant. We proposed to try and find a market for them.''

This and other testimony indicates that the nature of defendants' plan was to secure slow-selling non-dividend-paying stock that nevertheless could be converted into cash. Defendants' offers to sell or trade the stock they proposed to issue were not limited to those who had been contacted by letters; the testimony shows a willingness on the part of appellants to deal with anyone who might become interested.

We purposely refrain from defining either a public or private offering, and hold that the facts in this case warrant the conclusion reached by the trial judge ''that the securities of the Industries Trust

& Finance Corporation were offered to the public and the transactions fall within the inhibition of the statute."

Were subscriptions solicited by advertising? The act does not contain its own definition of the word "advertising." Appellants say the so-called prospectus was in reality only a form letter and not "advertising." The act should not be rendered impotent by a narrow interpretation of its language. The word as used in the act is certainly not limited to a notice or offer printed in a newspaper or periodical having general or local circulation, and we may take judicial notice of the widespread use of the mail for advertising. In section 16 of the act (2 Comp. Laws 1929, § 9784, as amended by Act No. 37, Pub. Acts 1935), we find the word used in speaking of "a prospectus or other type of circular or advertising." The word "advertise" is defined in 2 C. J. S. p. 890 as

"To advise, to announce, to apprise, to command, to give notice of, to inform, to make known, to notify, to publish," etc.

"It has been said that originally the word (advertising) meant 'noticing,' or 'observing,' but gradually became extended until now it means 'making public intimation or announcement of anything,' whether by publication in newspapers, or by handbills, or by oral proclamation."

Many authorities, while not directly in point, but which are of value in a discussion of the problems arising out of the operation of the "blue sky law," are collected and commented on in 87 A. L. R. 42. See, also, 34 Michigan Law Review, p. 1135 (June, 1936).

We again find ourselves in agreement with the trial judge, who said:

"Defendants urge that by 'advertising' the statute means 'announcement in periodicals or by handbills or placards.' It is not believed that the legislature intended that the 'advertising' should be done in any particular way, otherwise they would have so specified in the act. There are many definitions of 'advertising,' and some of them, such as 'to inform' * * * 'advise' * * * 'a giving notice, information, notification' (Standard Dictionary), appear to fit this case. The printing and widely circulating of the prospectus inviting the public to subscribe for the stock, the many letters (some 240 of them) written and sent for the same purpose, and the personal display and distribution of the literature for the same purpose, must be held to be 'advertising' within the meaning of the statute."

The judgments of guilty are affirmed.

NORTH, BUTZEL, SHARPE, POTTER, and CHANDLER, JJ., concurred with BUSHNELL, J.

WIEST, J. (*concurring*). I concur in affirmance on the ground that defendants made a "public offering," but do not concur in holding the letters "advertising," within the meaning of the statutory prohibition.

FEAD, C. J., concurred with WIEST, J.