## SECURITIES AND EXCHANGE COMMISSION *v.* C. M. JOINER LEASING CORPORATION ET AL.

No. 24. Argued October 18, 1943.—Decided November 22, 1943.

*Mr. John F. Davis,* with whom *Solicitor General Fahy* and *Messrs. Richard S. Salant, Milton V. Freeman,* and *Louis Loss* were on the brief, for petitioner.

*Mr. David A. Frank* for respondents.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The Securities and Exchange Commission brought this action in District Court to restrain respondents from further violations of §§ 5 (a) and 17 (a) (2) and (3) of the Securities Act of 1933.[1]  The District Court denied relief and the Circuit Court of Appeals affirmed upon a construction of the statute which excludes from its operation all trading in oil and gas leases.  133 F. 2d 241.  As this presents a question important to the administration of the Act we granted certiorari.[2]

Respondents and one Johnson, a defendant against whom a decree was taken by consent, engaged in a campaign to sell assignments of oil leases.  The underlying leases, acreage from which was being sold, are not in the record.  They required, as appears from the assignments, annual rental in case of delayed drilling of $1 per year.

---

[1] 48 Stat. 74, 15 U. S. C. § 77e (a) and § 77q (a), (2), (3).

[2] 318 U. S. 755.

It also seems that these leases were granted by the landowners on an agreement that a test well would be drilled by the lessees. One Anthony blocked up leases on about 4,700 acres of land in McCulloch County, Texas, in consideration of drilling a test well. Defendant Joiner testified that he acquired 3,002 of these acres for "practically nothing except to drill a well." Anthony was a driller and agreed to do the drilling which the Joiner Company undertook to finance, expecting to raise most of the funds for this purpose from the resale of small parcels of acreage. The sales campaign was by mail addressed to upwards of 1,000 prospects in widely scattered parts of the country and actual purchasers, about fifty in number, were located in at least eighteen states and the District of Columbia. Leasehold subdivisions offered never exceeded twenty acres and usually covered two and a half to five acres. The prices ranged from $5 to $15 per acre. The largest single purchase shown by the record was $100, and the great majority of purchases amounted to $25 or less. All buyers were given the opportunity to pay these sums in installments, and some did so.

The sales literature nowhere mentioned drilling conditions which the purchaser would meet or costs which he would incur if he attempted to develop his own acreage. On the other hand, it assured the prospect that the Joiner Company was engaged in and would complete the drilling of a test well so located as to test the oil-producing possibilities of the offered leaseholds. The leases were offered on these terms: "You may have ten acres around one or both wells at $5 per acre cash payable by August 1st, 1941 and $5 per acre additional payable November 1st, 1941 or thirty days after both wells are completed." Other language in the advertising literature emphasized the character of the purchase as an investment and as a participation in an enterprise.[3]

---

[3] The following are extracts from letters signed by the Joiner Company and by Joiner: "We are pleased to report our Concho County

The trial court made findings of what amounted to fraud, and the Circuit Court of Appeals approved, saying, "the evidence would justify stronger findings of fraud." [4] However, both courts refused injunction be-

well drilling at approximately 2510 feet in a very good formation. We are sending out 800 feet of 8¼ inch casing to be run in the Mc-Culloch County well tomorrow. Both wells should be completed during next month . . . This offer goes to you who now have a lease around one or both of these locations, and also to you who have at some time invested in a lease or leases around some well that the C. M. Joiner Interests have drilled. . . . we are submitting this proposition to you in language that will appeal only to business people who are interested in making an investment where they have a good chance for splendid returns on the investment." "There has nothing happened to either of these wells that would lessen the prospects for the opening of a new oil field. . . . We feel that if we are to get the law of average that one or both these wells should be producers. I know you would like the thrill that comes to those owning a lease around a producing well. . . . if you send in an order for twenty acres . . . you will get ten acres Free in the next block of acreage we drill which is most likely to be in Concho County, Texas. You will really be in the oil business." "Remember, if *you* do not make money on your investment it will be impossible for us to make money. . . . Fortunes made in oil go to those who invest. We believe you should invest here, and now!"

There is also on the circulars and selling letters the following statement:

"Because these securities are believed exempted from registration they have not been registered with the Securities and Exchange Commission; but such exemption, if available, does not indicate that the Securities have been either approved or disapproved by the Commission or that the Commission has considered the accuracy or completeness of the statements in this communication."

The origin of this is uncertain from the evidence. Joiner says he "got it" from the Commission. What weight, if any, should be given under the circumstances to this characterization of what was being sold as "securities" is not clear. They had to be securities to be exempt securities under the Act. 15 U. S. C. § 77c.

[4] The nature of the misrepretrations is not material to the question here. They related generally to the location of the properties in respect of producing territory.

cause, as the Court of Appeals stated, it could "find simply sales and assignments of legal and legitimate oil and gas leases, i. e., sales of interests in land." It was thought that these assignments could not be proved to be "securities" or "investment contracts" under § 2 (1) of the Act.

Undisputed facts seem to us, however, to establish the conclusion that defendants were not, as a practical matter, offering naked leasehold rights. Had the offer mailed by defendants omitted the economic inducements of the proposed and promised exploration well, it would have been a quite different proposition. Purchasers then would have been left to their own devices for realizing upon their rights. They would have anticipated waiting an indefinite time, paying delayed drilling rental meanwhile until some chance exploration proved or disproved the productivity of their acres. Their alternative would have been to test their own leases at a cost of $5,000 or more per well.[5]

But defendants offered no such dismal prospect. Their proposition was to sell documents which offered the purchaser a chance, without undue delay or additional cost, of sharing in discovery values which might follow a current exploration enterprise. The drilling of this well was not an unconnected or uncontrolled phenomenon to which salesmen pointed merely to show the possibilities of the offered leases. The exploration enterprise was woven into these leaseholds, in both an economic and a legal sense; the undertaking to drill a well runs through the whole transaction as the thread on which everybody's beads were strung. An agreement to drill formed the consideration upon which Anthony was able to collect leases on 4,700 acres. It was in return for assumption of this agreement

---

[5] Joiner's well was to cost over $5,000. The estimated average cost of drilling wells in West Central Texas is about $10,000. See table reproduced in House Hearings on H. Res. 290 and H. R. 7372, 76th Cong., 3d Sess. (1939) Pt. I, p. 350.

that Joiner got 3,002 of the acres, leaving Anthony about 1,700 acres for his trouble. And it was his undertaking to drill the well which enabled Joiner to finance it by the sale of acreage. By selling from 1,000 to 2,000 acres at from $5 to $15 per acre, he could fulfill his obligation to drill the well, recoup his incidental expenses and those of the selling intermediaries, and have a thousand acres left for the gamble, with no investment of his own; and if he sold more, he would have a present profit. Without the drilling of the well, no one's leases had any value, and except for that undertaking they had been obtained at no substantial cost. The well was necessary not only to fulfill the hopes of purchasers but apparently even to avoid forfeiture of their leases.

Whether, as the dissenting Judge below suggests, the assignee acquired a legal right to compel the drilling of the test well is a question of state law which we find it unnecessary to determine. The terms of the offering as quoted above, either by itself or when read in connection with the agreement to drill as consideration for the original leases, might be taken to embody an implied agreement to complete the wells. But at any rate, the acceptance of the offer quoted made a contract in which payments were timed and contingent upon completion of the well and therefore a form of investment contract in which the purchaser was paying both for a lease and for a development project.

It is clear that an economic interest in this well-drilling undertaking was what brought into being the instruments that defendants were selling and gave to the instruments most of their value and all of their lure. The trading in these documents had all the evils inherent in the securities transactions which it was the aim of the Securities Act to end.

It is urged that the definition of "security" which controls the scope of this Act [6] falls short of including these transactions. Respondents invoke the *"ejusdem generis* rule" to constrict the more general terms substantially to the specific terms which they follow. And they invoke the ancient maxim *"expressio unius est exclusio alterius"* to exclude sales of leasehold subdivisions by the acre because the statute expressly includes sales of leasehold subdivisions by undivided shares.

Some rules of statutory construction come down to us from sources that were hostile toward the legislative process itself and thought it generally wise to restrict the operation of an act to its narrowest permissible compass.[7] However well these rules may serve at times to aid in deciphering legislative intent, they long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general pur-

---

[6] Section 2 (1) of the Act, 15 U. S. C. § 77b (1), provides:

"The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

[7] In the first edition of Statutes and Statutory Construction by Sutherland he no doubt expressed the impression gleaned from extensive reading of cases when he wrote in the preface (1890): "The natural tendency and growth of the law is towards system and towards certainty, towards modes of operation at once practical and just, by the process of its intelligent judicial administration; but this process is impaired by overwork and legislative interference." In the third edition (1943) Horack observes in the preface: "The third edition reflects the growing acceptance of statutes as a creative element in the law rather than, as Sutherland suggested in the first edition, as 'legislative interference'."

pose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy.[8]

In the Securities Act the term "security" was defined to include by name or description many documents in which there is common trading for speculation or investment. Some, such as notes, bonds, and stocks, are pretty much standardized and the name alone carries well-settled meaning. Others are of more variable character and were necessarily designated by more descriptive terms, such as "transferable share," "investment contract," and "in general any interest or instrument commonly known as a security." We cannot read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents. Instruments may be included within any of these definitions, as matter of law, if on their face they answer to the name or description. However, the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as "investment contracts," or as "any interest or instrument commonly known as a 'security.'" The proof here seems clear that these defendants' offers brought their instruments within these terms.

---

[8] This Court has refused to follow the "ejusdem generis" rule, even in criminal cases, where its application seemed to conflict with the general purpose of an act. *United States* v. *Gilliland,* 312 U. S. 86, 93; *Prussian* v. *United States,* 282 U. S. 675, 679; and *Gooch* v. *United States,* 297 U. S. 124, 128; see also *Helvering* v. *Stockholms Enskilda Bank,* 293 U. S. 84, 88–89.

It has also treated the maxim "expressio unius est exclusio alterius" as but an aid to construction. *United States* v. *Barnes,* 222 U. S. 513, 519; *Springer* v. *Philippine Islands,* 277 U. S. 189, 206; *Neuberger* v. *Commissioner,* 311 U. S. 83, 88.

It is urged that because the definition mentions "fractional undivided interest in oil, gas or other mineral rights," it excludes sales of leasehold subdivisions by parcels. Oil and gas rights posed a difficult problem to the legislative draftsman. Such rights were notorious subjects of speculation and fraud, but leases and assignments were also indispensable instruments of legitimate oil exploration and production. To include leases and assignments by name might easily burden the oil industry by controls that were designed only for the traffic in securities. This was avoided by including specifically only that form of splitting up of mineral interests which had been most utilized for speculative purposes. We do not think the draftsmen thereby immunized other forms of contracts and offerings which are proved as matter of fact to answer to such descriptive terms as "investment contracts" and "securities."

Nor can we agree with the court below that defendants' offerings were beyond the scope of the Act because they offered leases and assignments which under Texas law conveyed interests in real estate.[9] In applying acts of this general purpose, the courts have not been guided by the nature of the assets back of a particular document or offering.[10] The test rather is what character the instru-

[9] *Downman* v. *Texas*, 231 U. S. 353; *Texas Co.* v. *Daugherty*, 107 Tex. 226, 176 S. W. 2d 717; *Railroad Commission* v. *Rowan & Nichols Oil Co.*, 310 U. S. 573, 579.

[10] One's cemetery lot is not ordinarily thought of as an investment and is most certainly real estate. But when such interests become the subjects of speculation in connection with the cemetery enterprise, courts have held conveyances of these lots to be securities. *Matter of Waldstein*, 160 Misc. 763, 291 N. Y. S. 697; *Holloway* v. *Thompson*, 42 N. E. 2d 421 (Ind. App.). For other instances where purported sales of property have been held "investment contracts" see *Securities & Exchange Comm'n* v. *Crude Oil Corp.*, 93 F. 2d 844 (interest in oil royalties sold as bill of sale for specified number of barrels of oil); *Securities & Exchange Comm'n* v. *Tung Corporation*, 32 F. Supp. 371; *Securities & Exchange Comm'n* v. *Bailey*, 41 F. Supp. 647 (land bearing

ment is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be.

Finally it is urged that we must interpret with strictness the scope of this Act because violations of it are crimes.[11] Some authority is cited and a great array could be assembled to support the general proposition that penal statutes must be strictly construed. An almost equally impressive collection can be made of decisions holding that remedial statutes should be liberally construed. What, then, shall we say of the construction of a section like this which may be the basis of either civil proceedings of a preventive or remedial nature or of punitive proceedings, or perhaps both?

Different courts have given different answers to the general question.[12] Since 1911, all states except Nevada have enacted some type of "Blue Sky Law." While the laws are not uniform, they generally contain both civil and criminal sanctions, and all have the dominating purpose to prevent and punish fraudulent floating of securities.[13] The weight of authority is committed to a liberal construction,[14] although some courts tend toward strict construc-

---

tung trees, to be developed by seller); *Securities & Exchange Comm'n v. Payne*, 35 F. Supp. 873 (silver foxes); *Prohaska v. Hemmer-Miller Development Co.*, 256 Ill. App. 331 (farm land, to be paid for with proceeds of crops raised by vendor); *Kerst v. Nelson*, 171 Minn. 191, 213 N. W. 904 (land to be cultivated as a vineyard by a third party); *Stevens v. Liberty Packing Corp.*, 111 N. J. Eq. 61, 161 A. 193 (rabbits).

[11] 15 U. S. C. § 77t.

[12] See 3 Sutherland on Statutory Construction (3d ed. 1943) § 5703.

[13] Smith, State Blue Sky Laws and the Federal Securities Act, 34 Michigan Law Review 1135.

[14] See note 10 *supra; Wagner v. Kelso*, 195 Iowa 959, 193 N. W. 1; *Wigington v. Mid-Continent Royalty Co.*, 130 Kan. 785, 288 P. 749; *People v. Montague*, 280 Mich. 610, 274 N. W. 347; *State v. Hofacre*,

tion,[15] and some have seemed to differentiate according to the use being made of the statute, inclining to a strict construction when a criminal penalty is being imposed and a more liberal one when civil remedies are being applied.[16]

But this Court, as early as 1820, speaking through Chief Justice Marshall, said: "The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. . . . It is said, that notwithstanding this rule, the intention of the law maker must govern in the construction of penal, as well as other statutes. This is true. But this is not a new independent rule which subverts the old. It is a modification of the ancient maxim, and amounts to this, that though penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases which those words, in their ordinary acceptation, or in that sense in which the legislature has obviously used them, would comprehend." *United States* v. *Wiltberger,* 5 Wheat. 76, 95.

---

206 Minn. 167, 288 N. W. 13; *State* v. *Pullen,* 58 R. I. 294, 192 A. 473; *Kadane* v. *Clark,* 135 Tex. 496, 143 S. W. 2d 197; *Klatt* v. *Guaranteed Bond Co.,* 213 Wis. 12, 250 N. W. 825.

In Texas itself, oil and gas leases have been held by the Supreme Court to be securities within the state act, notwithstanding the fact that the act expressly includes only "any interest in or under" such leases. *Kadane* v. *Clark, supra.*

[15] *Westenhaver* v. *Dunnavant,* 225 Ala. 400, 143 So. 823; *Somers* v. *Commercial Finance Corp.,* 245 Mass. 286, 139 N. E. 837; *New Amsterdam Casualty Co.* v. *Hyde,* 148 Ore. 229, 34 P. 2d 930, 35 P. 2d 980; *Miller* v. *Stuart,* 69 Utah 250, 253 P. 900.

[16] See 3 Sutherland on Statutory Construction (3d ed. 1943) § 7104 and cases cited in note 8 thereunder.

This rule in substance was repeated in *United States* v. *Hartwell,* 6 Wall. 385, 396, which said also: "The rule of strict construction is not violated by permitting the words of the statute to have their full meaning, or the more extended of two meanings, as the wider popular instead of the more narrow technical one; but the words should be taken in such a sense, bent neither one way nor the other, as will best manifest the legislative intent." The principle has been followed in *United States* v. *Corbett,* 215 U. S. 233, 242; *Donnelley* v. *United States,* 276 U. S. 505, 512; *United States* v. *Giles,* 300 U. S. 41, 48.

In the present case we do nothing to the words of the Act; we merely accept them. It would be necessary in any case for any kind of relief to prove that documents being sold were securities under the Act. In some cases it might be done by proving the document itself, which on its face would be a note, a bond, or a share of stock. In others proof must go outside the instrument itself as we do here. Where this proof is offered in a civil action, as here, a preponderance of the evidence will establish the case; if it were offered in a criminal case, it would have to meet the stricter requirement of satisfying the jury beyond reasonable doubt.

We hold that the court below erred in denying an injunction under the undisputed facts of this case and its findings. The judgment is

*Reversed.*

MR. JUSTICE ROBERTS is of the opinion that the judgment should be affirmed.

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.