CRESWELL-KEITH, Inc., an Arkansas Corporation, Trustee for Creswell-Keith Mining Trust, Plaintiff,

v.

B. F. WILLINGHAM, W. S. Bradham (also known as W. S. (Pete) Bradham), Mildred Willingham, and Floy Bradham, Defendants.

Civ. A. No. 731.

United States District Court
W. D. Arkansas,
Hot Springs Division.

March 26, 1958.

Nathan Schoenfeld, Hot Springs, Ark., for plaintiff.

Brown & Compton, El Dorado, Ark., McMillan & McMillan, Arkadelphia, Ark., for defendants.

JOHN E. MILLER, District Judge.

Separate motions to dismiss have been filed by the defendants, B. F. and Mildred Willingham, and by the defendants, W. S. (Pete) Bradham and Floy Bradham, and said motions are before the

Court upon the record and the briefs of the parties.

In its complaint plaintiff alleges that the Court has jurisdiction under 15 U.S.C.A. § 77v, and that all parties to the action are citizens of the State of Arkansas. Plaintiff further alleges:

"3. On several occasions in August, September, October and November, 1956, Defendants, B. F. Willingham and W. S. (Pete) Bradham orally offered to sell and assign to Plaintiff, through its president R. N. Keith, their undivided interests in certain leases of the gross production of oil, gas, and other minerals from lands situated in Union, Nevada, Ouachita and Dallas Counties in Arkansas. These interests referred to in this Complaint as *The Interests,* were offered for sale to Plaintiff together with certain personal property, accounts receivable and equipment of Oil Well Service Company (a joint enterprise entirely owned by Defendants, B. F. Willingham and W. S. (Pete) Bradham).

"4. On or about September 6, 1956, Defendants, B. F. Willingham and W. S. (Pete) Bradham and Plaintiff entered into an Escrow Agreement at The First National Bank of Gurdon, Arkansas, with that Bank named as Escrow Agent. Subject of the Agreement was:

" 'One Eighth of seven eights working interest of the 120 acres and four producing wells now in production known as the Newton Estate "A" Lease, wells A 1, 2, 3 and 4. (One, Two, Three and Four), more particularly described as Section 35, Township 17 S, Range 15 West.'

Under terms of the Escrow Agreement the Agent was to complete the assignment of the described interest (referred to in this Complaint as the one-eighth in the seven-eights of the Newton 'A') to Plaintiff if it obtained $7,000.00 from two separate bank accounts owned by Plaintiff ($5,000.00 from the Valley National Bank, Nogales, Arizona, in the account of Santa Lucia Y Anexas, a predecessor of Plaintiff and $2,000.00 from The Commercial National Bank, Little Rock, Arkansas) for Defendants.

"5. Defendants signed and mailed from Gurdon, Arkansas, and/or El Dorado, Arkansas, to the Stanolind Oil Purchasing Company of Tulsa, Oklahoma, a Division Order stipulation covering the transfer of the one-eighth in the seven-eights interest in the Newton 'A' Lease.

"6. Defendants then caused the Stanolind Oil Purchasing Company to mail its check to Plaintiff. The check sent through the U. S. Mail was received by Plaintiff in Hot Springs, Arkansas, on or about November 19, 1956. This check in the sum of $913.32 was represented by Defendants B. F. Willingham and W. S. (Pete) Bradham to Plaintiff as being one months 'run' on the Newton 'A' lease. In fact, it represented the accumulation of several months payments, which Defendants well knew.

"7. On the basis of the oil run check, referred to in Paragraph 6, the oral misrepresentations concerning it, and the other oral misrepresentations made to Plaintiff by Defendants, B. F. Willingham and W. S. (Pete) Bradham Plaintiff and Defendants entered into an Assignment Agreement dated November 29, 1956, by which Plaintiff purchased The Interests, and the personal property, accounts receivable and equipment of Oil Well Service Company. One of the properties involved in this transaction was the remaining portion of the Newton 'A' lease and it was the most substantial single item of consideration in the Assignment of November 29, 1956. Defendant's misrepresentation that the oil run check it caused to be mailed to Plaintiff was one months payment, led Plaintiff to believe the

worth of the Newton 'A' lease to be greater by far than it actually was and led Plaintiff to believe the other misrepresentations of Defendants.

"8. The Assignment of November 29, 1956 was a contingent Assignment, Complete upon Plaintiff paying certain debts and obligations of Defendants, B. F. Willingham and W. S. (Pete) Bradham and the Oil Well Supply Company.

"9. The Assignment, attached as Exhibit D, sets forth fully and describes the obligations and debts to be paid and *The Interests*, personal property, accounts receivable and Equipment of Oil Well Supply Company.

"10. Plaintiff has paid $90,000.-00 of these debts and obligations and Plaintiff has assumed and has accepted responsibility of payment of Obligations of Defendants in the further amount of $2,500.00 (for property damage in certain litigation over the salt water claims).

"11. On or about the 4th day of September, 1956, Defendants placed or caused to be placed, in the United States Mail at Gurdon, Arkansas, an envelope addressed to Valley National Bank at Nogales, Arizona, containing a Draft for $5,000.00.

"12. The Draft was duly delivered to First National Bank at Gurdon, Arkansas.

"13. There were other uses of the U. S. Mail as related in Paragraphs 4, 5, 6, and 7, and others not specifically stated here."

Plaintiff further alleges that the defendants, B. F. Willingham and W. S. (Pete) Bradham, made oral misrepresentations to plaintiff's president, R. N. Keith, concerning the interests purchased by plaintiff from defendants, and that under the provisions of Sec. 12 of the Securities Act of 1933 (15 U.S.C.A., § 77*l*), plaintiff is entitled to rescind the agreement and to recover the consideration paid therefor.

The escrow agreement of September 6, 1956, attached as Exhibit A to the complaint states among other things, that:

"This Agreement made and entered into by and between W. S. Bradham and B. F. Willingham, hereinafter known as parties of the First Part, and Creswell-Keith Mining Trust, hereinafter known as Party of the Second Part, Witnesseth:

"The attached Assignment of Working Interest in Oil and Gas Leases, together with stock in Creswell-Keith Mining Trust of the value of $8,000.00, and the sum of $7,000.00 in cash are hereby placed in escrow in the First National Bank, Gurdon, Ark., upon the following conditions, to-wit:

"That the assignment now held in the name of Mr. & Mrs. Marvin Harr in and for the One Eighth of seven eights working interest of the 120 acres and four producing wells now in production known as the Newton Estate 'A' Lease, Wells A 1, 2, 3, and 4. (One, two, three, and four.) More particularly described as Section 35, Township 17 S. Rg. 15 West.

"In the event that Mr. and Mrs. Harr sign over their assignment to the Party of the Second Part and the Existing Government Liens and all other liens or attachments are satisfied on the above described property and Oil Royalties, The Party of the First Part shall receive the above described $8000. in shares and $7000. in cash and the Party of the Second Part shall receive the Complete and executed assignment. If the Assignment is not completed according to the plan outlined above within 10 days of above date this Escrow Agreement shall be declared null and void and said Bank shall deliver said assignment to the Parties of the First Part and shall deliver said shares of stock and said $7000. to the party of the Second Part."

Exhibit B to the complaint indicates that on September 4, 1956, a bank charge of 50 cents was made in connection with a check sent Special Delivery airmail to the Valley National Bank, Nogales, Arizona. Exhibit C indicates that on September 6, 1956, $7,000 was deposited in the First National Bank of Gurdon, Arkansas, by the bank as escrow agent for W. S. Bradham, B. F. Willingham, and Creswell-Keith Mining Trust. Exhibit D to the complaint is a copy of the assignment of W. S. Bradham and B. F. Willingham of all their undivided interests in certain oil and gas leasehold estates and personal property thereon to plaintiff. The personal property was certain equipment used in connection with the operation of the wells on the leases.

In addition to the original complaint and exhibits thereto, plaintiff has also filed an amendment to its complaint alleging that as a part of the consideration for the assignment of November 29, 1956, plaintiff has been required to send more than 120 payments by means of the U. S. Mails. Attached to the amendment as Exhibit E is a list of these payments.

In their motions to dismiss defendants question the jurisdiction of the Court under the allegations made in the complaint.

Plaintiff contends that the Court has jurisdiction under the provisions of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., since the mails were used in connection with the transactions here involved. Defendants, however, contend that the use of the mails alleged by plaintiff was not such a use as would give the Court jurisdiction under the Act.

The principal statutes involved in this action are 15 U.S.C.A. §§ 77b, 77l, 77q, and 77v. Sec. 77b, supra, provides, inter alia:

"(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

Section 77l, supra, provides:

"Any person who—

\*     \*     \*     \*     \*     \*

"(2) offers or sells a security \* \* \* by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

Section 77q provides:

"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, * * *."

Section 77v provides:

"(a) The district courts of the United States * * * shall have jurisdiction * * * of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter."

The general purpose of the Securities Act of 1933 is stated in Wilko v. Swan, 346 U.S. 427, 430, 74 S.Ct. 182, 184, 98 L.Ed. 168, as follows:

"In response to a Presidential message urging that there be added to the ancient rule of caveat emptor the further doctrine of 'let the seller also beware,' Congress passed the Securities Act of 1933. Designed to protect investors, the Act requires issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale."

The Act is remedial and should be given a liberal construction. Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88; Whittaker v. Wall, 8 Cir., 226 F.2d 868, 871; Blackwell v. Bentsen, 5 Cir., 203 F.2d 690.

In determining whether the transactions involved herein were covered by the Act, the initial question is whether the interests purchased by plaintiff from defendants were and are "securities" within the meaning of 15 U.S.C.A. § 77b, supra. The defendants contend that the Act was intended to cover situations where a person creates fractional interests in oil and gas leases for the purpose of public offering, and was not intended to apply to a situation where a person merely sells to another an entire undivided interest in an oil and gas lease, together with equipment, as was done in the instant case.

The Court is inclined to agree that the Act may not have been intended to apply to such sales,[1] but 15 U.S.C.A. § 77b, supra, in no uncertain terms provides that the term "security" includes any "fractional undivided interest in oil, gas, or other mineral rights", and such fractional interests are involved in this action. Under the decisions these interests are securities within the meaning of the Act. Wall v. Wagner, D.C.Neb., 125 F. Supp. 854, affirmed Whittaker v. Wall, 8 Cir., 226 F.2d 868; Securities and Exchange Commission v. McBride, D.C. Tenn., 143 F.Supp. 562; Annotation, 163 A.L.R. 1050.

Having determined that the interests sold by defendants to plaintiff were securities within the meaning of the Act, the Court reaches the question of whether the complaint, as amended, together with the exhibits attached there-

1. The general scope of the Act, insofar as oil and gas rights are concerned, was stated in Securities and Exchange Commission v. C. M. Joiner Corp., supra, at page 352 of 320 U.S., at page 124 of 64 S. Ct. as follows:

"It is urged that because the definition mentions 'fractional undivided interest in oil, gas, or other mineral rights,' it excludes sales of leasehold subdivisions by parcels. Oil and gas rights posed a difficult problem to the legislative draftsman. Such rights were notorious subjects of speculation and fraud, but leases and assignments were also indispensable instruments of legitimate oil exploration and production. To include leases and assignments by name might easily burden the oil industry by controls that were designed only for the traffic in securities. This was avoided by including specifically only that form of splitting up of mineral interests which had been most utilized for speculative purposes. We do not think the draftsmen thereby immunized other forms of contracts and offerings which are proved as matter of fact to answer to such descriptive terms as 'investment contracts' and 'securities.'"

to, states a claim within the purview of 15 U.S.C.A. § 77*l*, supra.[2]

There is a definite split of authority upon the question of whether the misrepresentations prohibited by Sec. 77*l* must be made either by mail or by a communication in interstate commerce. Annotation, 50 A.L.R.2d at pages 1228, 1235. In a well reasoned opinion the court in Kemper v. Lohnes, 7 Cir., 173 F.2d 44, concluded that the misrepresentations must be made by means of a prospectus through the mail or by an oral communication in interstate commerce, such as by telephone conversations or radio broadcasts. Other courts, however, have held the Act applicable to situations where the misrepresentations were made orally (not in interstate commerce), but the securities were thereafter sent by mail or transported in interstate commerce. Blackwell v. Bentsen, supra; Schillner v. H. Vaughan Clarke & Co., 2 Cir., 134 F.2d 875; Wall v. Wagner, supra; Moore v. Gorman, D.C.N.Y. 75 F.Supp. 453; Securities and Exchange Commission v. Wimer, D.C.Pa., 75 F. Supp. 955.

■ In the instant case there is no allegation or contention that any misrepresentation was made by mail or interstate communication, or that the "securities" ever passed through the mail. The only mailing involved in this case included (1) two checks or drafts were sent through the mail in order for plaintiff to obtain the $7,000 which was placed in escrow; (2) a division order stipulation was mailed to the Stanolind Oil Purchasing Company after the first sale had occurred; (3) the oil company mailed a check to plaintiff; (4) after the second sale was consummated on November 29, 1956, plaintiff sent more than 120 payments through the mail in complying with its obligation under the agreement.

The Court is convinced that these allegations concerning the use of the mails are insufficient to give the Court jurisdiction under the Act. In all the cases

holding that the district courts have jurisdiction of similar actions, one of two things existed. Either there was misrepresentation sent through the mail or made orally in interstate commerce, or the securities involved were mailed or were transported in interstate commerce. This Court is aware of no case where a court has entertained jurisdiction when neither of these two factors existed.

In the case at bar, the "securities" were never placed in the mails and no misrepresentations were made by mail or interstate communication. The various uses of the mails alleged by plaintiff are insufficient to give the Court jurisdiction. Compare, Darwin v. Jess Hickey Oil Corp., D.C.Tex., 153 F.Supp. 667.

Plaintiff contends that the Court has jurisdiction since the mails were used by it to make payments to various persons under the terms of the assignment of November 29, 1956. There are two answers to this contention. First, this Court is of the opinion that the use of the mails to make payments is not a use of the mails contemplated by the Act. And second, the "payments" made by plaintiff were not made to defendants. They were merely payments made to third persons to discharge certain debts that plaintiff assumed as a part of the assignment of November 29, 1956. It might also be noted that Sec. 77*l*, supra, seems to contemplate the use of the mails by the seller rather than the use of the mails by the purchaser, such as the plaintiff in the instant case.

■ While it is true that the Act is to be construed liberally, nevertheless a court is not at liberty to extend the Act to every transaction in which the use of the mail is in any way remotely involved.

For the above reasons the Court is of the opinion that plaintiff's complaint does not state a claim over which this Court has jurisdiction, and that defendants' motions to dismiss should be granted.

2. The plaintiff also mentions 15 U.S.C.A. § 77q, in its complaint and brief, but primary reliance is placed upon Sec.

77*l*, and the relief sought by plaintiff is the relief specifically provided for in Sec. 77*l*.

On March 15, 1958, the plaintiff filed a motion to consolidate the instant case with Civil Action No. 738, in which B. F. Willingham and Mildred Willingham are plaintiffs, and the plaintiff in the instant case along with W. S. (Pete) Bradham and Floy Bradham are defendants. No. 738 has been removed from the Chancery Court of Union County, Arkansas, to this Court upon the petition of the plaintiff herein, Creswell-Keith, Inc., Trustee for Creswell-Keith Mining Trust, the defendant in Civil No. 738. D.C., 160 F. Supp. 741. In view of the disposition of the instant case, the Court does not reach the question as to whether the two cases should be consolidated for trial.

Therefore, an order should be entered dismissing plaintiff's complaint as amended.