547 F.2d 303
 Fed. Sec. L. Rep. P 95,875
Charles S. GRAINGER et al., on behalf of themselves and all
other similarly situated Purchasers of "Variable Investment
Plan" Contracts Issued and Sold by Great States Life
Insurance Company, Plaintiffs-Appellants,
v.
STATE SECURITY LIFE INSURANCE COMPANY et al., Defendants-Appellees.
 No. 75-3061.
 United States Court of Appeals, Fifth Circuit.
 Feb. 18, 1977.
 
 Marvin Cherner, J. Vernon Patrick, Jr., James W. May, Birmingham, Ala., for plaintiffs-appellants.
 John H. Morrow, Robert R. Reid, Jr., George R. Stuart, III, John W. Haley, Birmingham, Ala., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before GODBOLD, McCREE* and TJOFLAT, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 This case involves the issue of whether contracts sold by an insurance company are "securities" for purposes of the Securities Acts of 1933 and 1934.[1] The district court held that as a matter of law the contracts were insurance and not securities and therefore were not within the purview of the Securities Acts, and entered a Rule 54(b) judgment for defendants. Also the court denied the request of plaintiffs to certify a class consisting of all purchasers of the contracts. We reverse the judgment for defendants and vacate the refusal to certify the class.1a
 
 
 2
 In the early 1960's Great States Insurance Company was marketing what it termed "Variable Investment Plan" contracts ("VIP contracts"). These contracts were, at least in form, similar to participating coupon policies.[2] The VIP contracts sold to plaintiffs allegedly incorporated as part of their terms a section of the Illinois insurance laws which required companies offering both participating and nonparticipating policies to keep separate accounts and to allocate 90% of their "profits" on their participating policies to the benefit of their participating policyholders.
 
 
 3
 Each named plaintiff purchased one or more VIP contracts. Later Great States adopted a drastically reduced scale of dividends on its VIP contracts. Plaintiffs brought a class action against State Security Life Insurance Company (the successor to Great States through a statutory merger), and L. M. Nimmo and Nimmo and Associates, Inc., as controlling persons of Great States, alleging: (a) violations of § 5 of the 1933 Act by the failure to register the VIP contracts; (b) violations of § 17 of the 1933 Act, and § 10(b) of the 1934 Act and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5 (1976), in mailing material misrepresentations to buyers in connection with the sale of the VIP contracts; (c) common law fraud in connection with the sale of the VIP contracts; (d) breach of the VIP contract; and (e) violations of the antifraud and proxy provisions and rules of the 1934 Act and common law fraud, in connection with the 1968 merger between State Security and Great States.[3]
 
 
 4
 Defendants filed motions to dismiss, to quash service of process and to block discovery. The court overruled the motion of State Security to dismiss the common law fraud and breach of contract claims against it. It also overruled all motions of defendants concerning the claims relating to the 1968 merger. The court granted the motions of Nimmo and Nimmo and Associates to dismiss the common law fraud and breach of contract claims stemming from the sale of the VIP contracts. None of these rulings have been appealed. Two rulings which the court made are now before us. First, it dismissed all federal Securities Act claims arising out of the sale of the VIP contracts against all three defendants on the ground that the contracts were not covered by the Acts because they were insurance contracts, and thus the plaintiffs had failed to state a claim upon which relief could be granted. The court, under Rule 54(b), directed entry of judgment for the defendants on these federal Securities Acts claims. The court also denied plaintiffs' motion to certify a class consisting of VIP contract holders.[4]
 
 
 5
 Generally, conventional life insurance policies are not securities for purposes of the federal Securities Acts. This view is supported by the legislative history of the 1933 Act,[5] by the leading commentators in the securities law field, L. Loss, Securities Regulation, 496-501 (1961); 2 A. Bromberg, Securities Law: Fraud § 6.5(1) n. 92 at 134 (1968); and by dictum in the Supreme Court's decision in Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).[6]
 
 
 6
 However, as Professor Loss has noted, the concept of insurance is really a continuum ranging from one year term insurance, which is clearly pure insurance, through variable annuities to mutual fund shares and common stocks, which are equally clearly securities. L. Loss, Securities Regulation 2534 (1969 Supp.). Thus, various items which have usually been denominated "insurance" have been found to be "securities" for purposes of the federal Securities Acts. For example, in S.E.C. v. United Benefit Life Insurance Company, 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967), and S.E.C. v. Variable Annuity Life Insurance Company, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), the Supreme Court held that flexible fund or variable annuities are securities and are therefore subject to the provisions of the Securities Acts.[7]
 
 
 7
 The court below compared the VIP contracts with the policies involved in Variable Annuity and United Benefit and found the VIP contracts different because they provided for what the court termed a "significant" fixed death benefit of $10,000. The comparison of policies was proper, but the court could not stop at this point. In making a determination of what exactly was being offered by the Great States salesmen it was required to consider the methods used in selling the contracts.
 
 
 8
 In S.E.C. v. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) the Court held that in determining if an instrument is an investment contract, and therefore a security, "the terms of offer, the plan of distribution and the economic inducements held out to the prospect" were all relevant factors to be considered. 320 U.S. at 353, 64 S.Ct. at 124, 88 L.Ed. at 94. The Court went on to say that "(i)n the enforcement of an Act such as (the 1933 Act) it is not inappropriate that promoters' offerings be judged as being what they were represented to be." Id. (emphasis added). Numerous lower courts have correctly interpreted this language from Joiner as justifying a consideration of advertising and promotional efforts in ascertaining that items which intuitively would not seem to be securities are, in reality, securities within the meaning of the federal Acts, e. g., Miller v. Central Chinchilla Group, Inc., 494 F.2d 414, 417 (CA8, 1974) (chinchillas); Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027, 1034-35 (CA2, 1974) (Scotch whisky receipts); S. E. C. v. Brigadoon Scotch Distributors, Ltd., 388 F.Supp. 1288, 1290 (S.D.N.Y., 1975) (rare coins); S.E.C. v. Haffenden-Rimar, 362 F.Supp. 323, 325 (E.D.Va., 1973), aff'd, 496 F.2d 1192 (CA4, 1974) (Scotch whisky). Indeed, the Supreme Court itself in United Benefit examined the advertising used to sell the "policies" at issue in making its determination that the appellee was selling investment contracts and not insurance.[8]
 
 
 9
 While the district court recognized the authority of Joiner and the subsequent "advertising" cases, it attempted to limit their scope by formulating a rule that advertising and promotional efforts can be used to determine the character of an instrument only where that instrument is not clear on its face. In essence, the district court read into the Securities Acts a parol evidence rule. We think that interpretation cannot be sustained. First, neither Joiner nor any of the lower court "advertising" cases (with one possible exception) make use of the parol evidence rule in determining whether an item is a security.[9] More important, however, use of a parol evidence rule leads a court to focus on the wrong question. The proper question before the district court was not "what is the correct interpretation of the VIP contracts?" but "what were defendants purporting to sell to plaintiffs?"[10] The parol evidence rule may have some application to the former question. It is not relevant to the latter question.[11] Therefore, the district court must in making a determination of whether the VIP contracts were securities take into account all the circumstances attending the sale of the VIP contracts, including the provision of Illinois law allegedly incorporated into the contract.
 
 
 10
 We also have substantial doubts about the significance which the district court attributed to the death benefit on the VIP contracts. The mere presence of a death benefit of $10,000, or for that matter any given dollar amount, cannot conclusively establish that the insurance features of a particular contract are not simply window dressing on what is essentially an investment contract. Consideration must be given not only to the amount of the death benefit but also to the relationship between the size of the death benefit and the size of "premium" payments. A showing that the "premiums" were disproportionately high (in terms of insurance industry norms) in relation to the amount of the death benefit would be persuasive evidence that the VIP contracts were not being bought and sold for their insurance features, i. e., as insurance policies, but for their future "dividends," i. e., as investment contracts.[12]
 
 
 11
 The district court held that class action was not appropriate on the VIP contract fraud claims because the claims depended upon the particularized representations made to each class member. It is true that a class action is usually inappropriate in a securities fraud case where oral misrepresentations are involved. As we said in Simon v. Merrill Lynch, Pierce, Fenner and Smith, 482 F.2d 880 at 882 (CA5, 1973):
 
 
 12
 If there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action. See Rule 23. Advisory Committee's Official Note, 39 F.R.D. 98, 107 (1966). Thus, courts usually hold that an action based substantially, as here, on oral rather than written misrepresentations cannot be maintained as a class action.
 
 
 13
 However, as this quote indicates, the key concept in determining the propriety of class action treatment is the existence or nonexistence of material variations in the alleged misrepresentations. It is possible, although unlikely, that oral misrepresentations can be uniform, e. g., through use of a standardized sales pitch by all the company's salesmen. Plaintiffs in the present case should be given the opportunity to demonstrate the existence and use of such a device. If plaintiffs cannot do this, then the district court may quite properly refuse to certify a class on the grounds that common questions of law or fact do not predominate.
 
 
 14
 We therefore vacate the denial of class status to VIP contract holders.
 
 
 15
 REVERSED in part, VACATED in part, and REMANDED for further proceedings.
 
 
 
 *
 Of the Sixth Circuit, sitting by designation
 
 
 [1]
 15 U.S.C. §§ 77a-78kk
 1a This is a companion case to Hilgeman v. National Insurance Company of America (CA5, 1977), No. 75-1724, 547 F.2d 298, decided this date.
 
 
 [2]
 A participating policy is "one in which dividends are paid to policyholders based upon company earnings, so that net cost is determined by deducting the amount of such dividends from the gross premiums." 1 J. Appleman & J. Appleman, Insurance Law and Practice, § 9 (1965)
 The authors of this treatise go on to describe coupon policies in the following terms:
 "Coupon policies are usually considered to be nonparticipating in form, but, with the legal incidents usually attached thereto, they would seem properly to belong in the class of participating contracts. The rate is usually the same as for the latter group. The contract has inserted in it a sheet of coupons, one of which can be clipped each time a premium is paid. This may be sent to the company together with a remittance for the balance of the premium. The coupons often are graduated in amount, increasing in the same degree that ordinary dividends would increase, and interest is figured thereon at the company's regular rate.
 "Thus, it is usually considered that if the insured fails to clip such a coupon and instead sends the full amount of the premium to the company, he has elected to permit it to remain at interest, and no further action on his part is usually required."
 Id. at § 10.
 
 
 [3]
 At least one of the plaintiffs was also a shareholder of Great States
 
 
 [4]
 The class determination is appealable under the general rule that "interlocutory orders from which no appeal lies are merged into the final judgment and open to review on appeal from that judgment." Monarch Asphalt Sales Co., Inc. v. Wilshire Oil Co., 511 F.2d 1073, 1077 (CA10, 1975); 7A Wright & Miller, Federal Practice & Procedure § 1802 at 270 (1972)
 
 
 [5]
 In the House Report on the 1933 Act it was clearly stated that ". . . insurance policies are not to be regarded as securities subject to the provisions of the act." HR Rep. No. 85, 73rd Cong., 1st Sess. 15 (1933)
 
 
 [6]
 In Tcherepnin the Court pointed out that Congress had specifically stated that " 'insurance policies are not to be regarded as securities subject to the provisions of the act . . . and the exemption from registration for insurance policies was clearly supererogation.' " 389 U.S. at 342-43, n. 30, 88 S.Ct. at 556, 19 L.Ed.2d at 572-73, n. 30 (cites omitted)
 Justice Brennan, in his concurring opinion in S.E.C. v. Variable Annuity Life Ins. Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), made virtually the same point when he said that "(u)nder the Securities Act, it would appear that in the case of the ordinary insurance policy, the exemption would be just confirmatory of the policy's noncoverage under the definition of security." 359 U.S. at 74, n. 4, 79 S.Ct. at 623, 3 L.Ed.2d at 646, n. 4 (cites omitted).
 
 
 [7]
 More recently the Securities and Exchange Commission has ruled that variable death benefit life insurance policies are also "securities." Securities Act Release No. 33-5360 Fed.Sec.L.Rep. (1972-73 Decisions) P 79,207
 
 
 [8]
 Speaking for a unanimous Court Justice Harlan noted that,
 "United's primary advertisement for the 'Flexible Fund' was headed 'New Opportunity for Financial Growth.' United's sales aid kit included displays emphasizing the possibility of investment return and the experience of United's management in professional investing."
 387 U.S. at 211, n. 15, 87 S.Ct. at 1562, 18 L.Ed. at 679, n. 15.
 
 
 [9]
 The district court cited Chapman v. Rudd Paint & Varnish, 409 F.2d 635 (CA9, 1969), as authority for its use of the parol evidence rule. However, the language in Chapman concerning the consideration of promotional advertising is dicta, for the Ninth Circuit did in fact examine the relevant advertising material in making a determination that a franchise arrangement was not a security
 
 
 [10]
 Cf. Goodman v. H. Hentz & Co., 265 F.Supp. 440, 444 (N.D.Ill., 1967) where sale of nonexistent securities was held to violate Rule 10b-5
 
 
 [11]
 Even if we were to hold that the parol evidence rule applied in the case before us, it still by its own terms would not operate to bar evidence of the oral representations made by Great States salesmen. First, plaintiffs' 10b-5 cause of action is a fraud-based cause of action. Cf. Ernst and Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Traditionally, the parol evidence rule will not operate to exclude parol evidence introduced to show fraud. Restatement of Contracts § 238(b), (1932). Moreover, many of the words in the VIP contracts such as "dividend" and "investment" possess a variety of meanings, and, generally speaking, parol evidence is admissible for the purpose of interpreting ambiguous language in contracts. Id. at § 233
 
 
 [12]
 Data on premium/death benefit ratios in participating life policies can be found. For example, such data was gathered by the SEC in formulating its now-rescinded Rule 3c-4 and incorporated therein in the form of a minimum multiple scale. We do not express any view on the substance of that no longer operational rule. We mention it merely to point out the availability of relevant data