UNITED STATES of America, Plaintiff,

v.

**John S. HOLTZCLAW, Jerry L. Horn, Donald L. Estes, and Joyce Morfey, Defendants,**

and

UNITED STATES of America, Plaintiff,

v.

**John S. HOLTZCLAW and Joyce Morfey, Defendants.**

**Criminal Action Nos. 3:96–00022, 3:96–00027.**

United States District Court, S.D. West Virginia, Huntington Division.

Jan. 14, 1997.

Larry R. Ellis, Philip H. Wright, Charleston, WV, for United States of America.

R. Clarke VanDervort, Charleston, WV, for Holtzclaw.

Gregory J. Campbell, Charleston, WV, for Horn.

David Tapp, Somerset, KY, for Morfey.

Edward H. Weis, Charleston, WV, for Estes.

### OPINION AND ORDER

GOODWIN, District Judge.

The defendants argue in support of motions for judgment of acquittal that the government failed to prove that a security was involved in the transaction for which they were prosecuted and found guilty.[1]   The is-

---

1. At trial, defendants John Holtzclaw, Jerry Horn, Donald Estes, and Joyce Morfey were each convicted of securities fraud in violation of 15 U.S.C. § 78j(b) & 78(ff), 17 C.F.R. § 240.10b–5; conspiracy to transport in interstate commerce securities and money taken by fraud in violation

sue for decision is whether the "pyramid scheme" sold by the defendants is an investment contract and thus a security.

In the aftermath of the stock market crash of 1929, Congress enacted two significant statutes regulating securities. "The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors." *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975).

In 1942, the Securities and Exchange Commission exercised the authority granted to it by Congress and promulgated Rule 10b–5. That section now provides as follows:

> It shall be unlawful for any person, directly or indirectly, by use of the mails or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
>
> > 1) to employ any device, scheme, or artifice to defraud,
> >
> > 2) to make any untrue statement of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> >
> > 3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> *in connection with the purchase or sale of a security.*

Rule 10b–5, 17 C.F.R. § 240.10b–5 (emphasis added). The defendants were prosecuted for securities fraud under this rule. (Information, p. 7).

The security referred to in 10b–5 must conform to the definition established in section 2(1) of the Securities Act of 1933, which defines a security as:

> any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract,* voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1) (emphasis added).

Thus, a threshold issue in any securities fraud case brought under Rule 10b–5 is whether the transaction for which the defendants are prosecuted involves a security. *See Marine Bank v. Weaver,* 455 U.S. 551, 555, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982) (holding that neither certificate of deposit nor agreement at issue in that case was a security). Congress did not intend the securities laws to be a broad federal remedy for all fraud. *Id.* at 556, 102 S.Ct. at 1223–24; *Reves v. Ernst & Young,* 494 U.S. 56, 65, 110 S.Ct. 945, 951, 108 L.Ed.2d 47 (1990). Just as mail fraud must involve the mail, 18 U.S.C. § 1341; wire fraud must involve a wire, 18 U.S.C. § 1343; and bank fraud must involve a bank, 18 U.S.C. § 1344; so, securi-

of 18 U.S.C. § 371; and interstate transportation of money taken by fraud in violation of 18 U.S.C. § 2314. John Holtzclaw was convicted of two additional counts of interstate transportation of money taken by fraud in violation of 18 U.S.C. § 2314; three counts of money laundering in violation of 18 U.S.C. § 1957; and three counts of perjury before the grand jury. Joyce Morfey also was convicted of perjury before the grand

jury. The Court overruled the defendants' several motions for judgment of acquittal at the end of trial, except the motions concerning the securities fraud count, which the Court took under advisement and reserved ruling as provided by Rule 29(b) of the Federal Rules of Criminal Procedure. After the guilty verdict, the motions were renewed and are now before the Court for decision.

ties fraud must involve a security. The securities laws cover those instruments commonly considered to be securities in the commercial world. The Act covers not only the enumerated instruments, but also reaches beyond to encompass the "many types of instruments that in our commercial world fall within the ordinary concept of a security." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946) (quoting H.Rep. No. 85, 73rd Cong., 1st Sess., p. 11).

In determining whether to grant a motion for judgment of acquittal, the Government is entitled to the benefit of all reasonable inferences, and credibility of the witnesses should not be considered. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir.1982) (reasonable inferences); *United States v. Saunders*, 886 F.2d 56, 60 (4th Cir.1989) (witness credibility). If, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt, then a motion for judgment of acquittal must be denied. *Tresvant*, 677 F.2d at 1021.

## I.

The Government, in arguing that an investment contract was sold, would have the court limit its consideration to representations made by Reverend Shinn at a February 18, 1991 meeting with the Matewan Church board of trustees. *See* Trial trans., vol. IV, pp. 121–22. Relying on the Seventh Circuit's decision in *S.E.C. v. Lauer*, 52 F.3d 667 (7th Cir.1995), the Government argues that these representations are the "security" for purposes of the Act. However, the Court must look further and analyze the transaction "on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." *Marine Bank v. Weaver*, 455 U.S. 551, 560 n. 11, 102 S.Ct. 1220, 1225 n. 11, 71 L.Ed.2d 409 (1982).

In making that analysis, the Court recognizes that instruments bearing the traditional titles included within the explicit statutory terms are not at issue in this case. No stocks, bonds, or notes changed hands. The question is whether the defendants' pyramid scheme transaction with the Matewan Church involved an investment contract—one of the more variable types of securities covered by the statute.

### The Factual Setting

In 1990, the United States Corps of Engineers determined that a church building owned by the First Assembly of God (Matewan Church) was located on an unprotectable flood plain. The Corps condemned the building and compensated the Matewan Church by paying $375,000. The Matewan Church then paid off its existing debts and deposited the remaining $200,000 in the Matewan National Bank pending the construction of a new church.

The Matewan Church needed a building site for the new church and enlisted the aid of the Reverend Gordon Shinn who was a pastor of the Heritage Assembly of God in nearby Dublin, Virginia who had prior construction and engineering experience. While looking for suitable real estate, Reverend Shinn visited and "fellowshipped" with the Matewan congregation. During this time, Reverend Shinn learned that church leaders were dissatisfied with the interest rate being earned on the $200,000 deposited with the Matewan National Bank. The leaders asked Shinn to help them find a better rate of return. At this point, the events that surround and include the financial transaction at issue in this case began.

Reverend Shinn accepted the assignment to find a better rate of return. He had no financial background, so he turned to acquaintances who did. Shinn called the defendant, John Holtzclaw, in Kentucky, who by star-crossed circumstance was then involved with the other defendants in marketing the Sell America "pyramid scheme." Sell America was an Alabama corporation involved in multi-level marketing programs. In the following weeks, Shinn had many conversations with the defendants Holtzclaw, Estes, and Horn. According to Shinn, the defendants Holtzclaw, Estes, and Horn, all told him of the golden opportunities awaiting those who would participate in the Sell America program. Shinn was apparently dazzled.

At a February 14, 1991 meeting with the Board of Trustees of the Matewan Church,

Shinn told the Board an alchemist's tale of riches with "no risk":

Q. What occurred at that meeting?

A. At that meeting we discussed the investment from the monies that the Church had to a no-risk investment. We discussed the potentials and opportunities of that investment for the Church and their upcoming relocation.

Q. What, if anything, did you say to the board about the risk involved for this investment?

A. I told them there was no risk.

(Trial trans., vol. III, p. 172) (Shinn Testimony). Shinn arranged another meeting with the board of trustees to complete the deal. Reverend Larrison (the Matewan pastor), each of the defendants, and every member of the Board of Trustees attended that meeting on February 18, 1991. The defendants prepared and brought to the meeting an agreement authorizing them to carry away the money for an "investment" in the Sell America program. Shinn preached his sermon of a "no risk investment" complete with homilies about tributaries flowing into rivers and pieces of pie—all to the end of getting the Matewan Church's money. As Shinn testified:

I presented to the board of trustees that night an investment opportunity with a company called Sell America. I informed the board of trustees that they dealt with gold-minted coins, not with mines or speculation. It was after the gold was found. It was U.S. minted coins. So there was no speculation.

I informed them in my presentation that the investment was risk-free. I told them I was very excited about the opportunities of the investment. I told them that I was fully confident of the investment.

I told them, in explanation of investments, that it was similar to buying a piece

of pie. A restaurant buys a piece of pie for, say, two dollars. And I don't know what—I mean a whole pie. I don't know what a whole pie costs, but a restaurant may buy a whole pie for two dollars and sell each piece for two dollars apiece. And that's how they generated profits. They buy in a large volume and then sell the individual pieces.

I also included a river analogy where a stream starts quite small but as tributaries are added to it, it becomes larger and more powerful. And investors in firms like Sell America, each tributary added to the size of their buying power. In other words, the size of the river would grow as more tributaries joined it.

I also alluded to the fact that investors that invest in companies like car manufacturers like Chrysler, the cars are sold, but the investors aren't selling the cars. And I reiterated the fact it was an exciting and great opportunity. And I poured all my belief in that before that board of trustees.

(Trial trans., vol. II, pp. 176–77).

The trustees questioned the defendants lightly, but were assured by their trust in Reverend Larrison and Reverend Shinn.[2] Jerry Horn displayed a gold coin and said, "[T]his is what you're investing in and that's your security right there." (Trial trans., vol. III, p. 185) (Phillips testimony). Another defendant, John Holtzclaw, stated that there would be very little risk involved because the "money would be in gold coins or be in a federally audited trust fund." (Trial trans., vol. III, p. 166) (York testimony). Holtzclaw also counseled that gold was a solid investment because its price always paralleled the price of bread. (Trial trans.; vol. II, p. 181) (Shinn testimony).[3] Except for those remarks, the defendants remained largely silent and did not correct Shinn at any point during his presentation. The church secre-

---

2. Mr. York, a member of the Board of Trustees, testified that the Board relied on Shinn and Reverend Larrison.

Q. Mr. York, isn't it true that you all entered into this agreement—you did as a member of the board—basically because you put faith and trust and reliance upon Gordon Shinn and your pastor?

A. Yes.

(Trial trans., vol. III, p. 170); see also the testimony of Terry Blankenship (Trial trans., vol. III, pp. 158–59).

3. Shinn's testimony that Holtzclaw was the one who compared gold to bread is contradicted by York. York attributes the bread statements to Shinn. (Trial trans., vol. III, pp. 164–65).

tary was dispatched to get a check; the agreement was signed; and the money left Matewan in the hands of the defendants and Reverend Shinn. The defendants took the check across the West Virginia state line to a restaurant in Kentucky where most of the paper work was completed for the purchase of "3–B" contracts in the Sell America scheme. Shortly, the money was gone to Alabama in payment for these "gold contracts." The Church lost all of it's money. The congregation was shocked. The trustees felt guilty. The pyramid pharaohs in Alabama were prosecuted with the help of the defendants and received light sentences. An investigation in West Virginia led to the indictments in this case.

### Contents of Instruments

In every United States Supreme Court case addressing the definition of a security there has been a document at the center of the transaction. *See Reves v. Ernst & Young,* 494 U.S. 56, 62, 110 S.Ct. 945, 949–50, 108 L.Ed.2d 47 (1990) (promissory notes); *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985) (stock purchase agreement); *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982) (certificate of deposit and profit sharing agreement); *International Bhd. of Teamsters v. Daniel,* 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979) (pension plan); *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (stock in housing co-operative); *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (withdrawable capital shares); *S.E.C. v. United Benefit Life Ins. Co.,* 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967) (variable annuity); *S.E.C. v. Variable Annuity Life Ins. Co. of America,* 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) (variable annuity); *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) (title and service agreement); *S.E.C. v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) (oil and gas leases). The Court recognized that in some cases, an instrument's contents brings it "within the class Congress intended to regulate" as a security. *Reves,* 494 U.S. at 62, 110 S.Ct. at 949–50. In most of the cases before the Supreme Court and other courts, however, further analysis was required. *See e.g. S.E.C. v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); *Grainger v. State Security Life Ins. Co.,* 547 F.2d 303, 307 (5th Cir.1977) (recognizing that "all the circumstances attending the sale" of instruments must be considered when determining whether an instrument is a security), *cert. denied,* 436 U.S. 932, 98 S.Ct. 2832, 56 L.Ed.2d 777 (1978); *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1039–40 (10th Cir.1980) (stating that "promotional materials, merchandising approaches, oral assurances and contractual agreements" have all been considered in "virtually every relevant investment contract case" when determining whether a security existed).

In this case, the relevant documents involved in the transaction are the Sell America brochure, the Agreements, and the "3–B" gold contracts.

Reverend Shinn testified at trial and before the grand jury that the defendants gave every person attending the February 18, 1991 meeting a Sell America brochure with gold coins on the front of it.[4] That brochure described the pyramid scheme in detail. The brochure described a "Unitary Marketing Plan" as follows:

> The third option you may choose to participate in is the Unitary Marketing Plan. This program is strictly for those who wish to both purchase Gold Eagle coins *and* earn commissions for selling them to others. If you are successful in your sales efforts you may choose to apply your com-

---

4. The board members do not remember seeing the brochure on the night of February 18, 1991. However, Shinn—the principal Government witness—testified before the grand jury and at trial that the defendants gave one of the brochures to everyone at the meeting. (Trial trans., vol. II, p. 234). Without exception, the board members' memory of the February 18 meeting is sketchy. None remembers the discussion of rivers, tributaries, and pies that Reverend Shinn so vividly recalls. In essence, the board members remember only that four professionals and a preacher presented a "risk-free" investment that would yield an 18% or better return and a gold coin that was flashed by Horn. Because of the board members' threadbare memory, the Government relied heavily on Shinn's testimony regarding the February 18 meeting.

mission to satisfy the outstanding balance on your own purchase agreement.

The concept is simple. You start with an initial down payment of as little as $60. As you sell Gold Eagle coin purchase agreements, you can use the commissions you earn to complete your own purchase agreements. Upon completion of each agreement you can receive the coins or, if you choose, have the value of the coins applied toward the initial payment required for the next higher denomination purchase agreement.

*The following illustrations are hypothetical as to how this program could work in theory. Of course, your earnings are based solely upon your own efforts and abilities.*

### PURCHASE AGREEMENT FOR U.S. MINTED GOLD EAGLE COINS

| Agreement | A | B | C | D | E | F * | G * |
|---|---|---|---|---|---|---|---|
| Face Value | $240. | $720. | $2,000. | $6,000. | $18,000. | $32,000. | $48,000 |
| Initial Payment | 60. | 180. | 500. | 1,500. | 4,500. | 8,000. | 12,000 |
| Administrative | 60. | 180. | 500. | 1,500. | 4,500. | 8,000. | 12,000 |
| Net Comm./Gold | 180. | 540. | 1,500. | 4,500. | 13,500. | 24,000. | 36,000 |

**HOW IT WORKS.**

As you can see from the chart, several types of gold coin purchase agreements are available through Sell America. These agreements come in various face values, and you can begin by purchasing any agreement you choose.

Suppose, for example, you begin with Purchase Agreement A, an agreement with a purchase value of $240. You pay Sell America an initial payment of $60. You then sell four identical purchase agreements to others, who each make a $60 payment. You will have now earned $180 in commissions. This money is enough to complete your $240 agreement with Sell America, Inc. Less administrative fees, the balance of $180 in gold coins will be shipped to you in a timely manner.

. . .

\* Purchase Agreements F & G are available after October 15th 1990.

(Govt.Ex. No. 9B) (emphasis in original).

The brochure reveals that what was purchased was not gold coins at a ridiculously inflated price, but rather the "idea" that the purchasers could make money by doing unto others what was done unto them. Sell America's role was to act as a clearing house for repetitions of the fraud and to skim from those purchasers who failed to extend the series of one-on-one frauds.

The next document in this case is the agreement entered into at the end of the February 18, 1991 meeting. That agreement states in its entirety:

*Agreement*

This Agreement, made and entered into this 18 day of February, 1991 by and between First Assembly of God of Matewan, West Virginia ("First Assembly"), Gordon Shinn Ministries, Inc. ("Shinn Ministries") and Gold Eagle Enterprises ("Gold Eagle").

WITNESSETH:

WHEREAS, First Assembly has recently received some funds which are not likely to be needed for use by it for approximately 12 months.

WHEREAS, Shinn Ministries and Gold Eagle are willing to assist First Assembly in using such funds to buy and sell gold coins with Sell–America, Inc. (based in Birmingham, Alabama) in a program known as the "3–B" program (hereinafter "Gold Program").

NOW THEREFORE, based on the foregoing premises and other good and valuable consideration, it is agreed by the parties as follows:

(1) First Assembly and Shinn Ministries hereby place with and deliver to Gold Eagle the sum of $200,000, such sum represents initial payments on behalf of First Assembly as well as initial payments made by sales of First Assembly and Shinn Ministries. Commissions earned on these sales are to be utilized within the Gold

Program in accordance with the Personal Option Sheet.

(2) Gold Eagle reasonably believes that First Assembly will earn commissions within a twelve month period that will equal it's initial payments plus ~~Twenty Five~~ Eighteen (~~25%~~ 18%). [Next to the handwritten changes appear the initials of John Holtzclaw, Reverend Larrison, and Reverend Shinn].

(3) First Assembly and Shinn Ministries hereby authorize and empower Gold Eagle to structure sales for the First Assembly in the Gold Program in order for it to receive the commissions described in Paragraph (2) above.

WHEREOF, the Parties have hereunto set their hands to this Agreement on the date and year first above mentioned.

First Assembly of God of Matewan, W.Va.
By /s/ Rev. Tommy Larrison

Gordon Shinn Ministries, Inc.
By /s/ Gordon Shinn

Gold Eagle Enterprises
By /s/ John S. Holtzclaw
Partner

(Govt.Ex. No. 15).

This document is the written manifestation of the intentions of the parties. By its plain terms, the Matewan Church's money was to be used "to buy and sell gold coins with Sell America, Inc. (based in Birmingham, Alabama) in a program known as the '3–B' program." That is, the money was to fund participation in Sell America's "3–B" program. According to the terms of the agreement, the Matewan Church's $200,000 was to be "place[d] with and deliver[ed]" to the defendants' Gold Eagle Enterprises partnership. That is exactly what happened—the check was handed over to the defendants, who took it to a fast food restaurant in Kentucky where it was exchanged for "3–B" gold contracts.

The "3–B" gold contracts are the third relevant documents. The defendants had filled them out before the February 18 meeting in obvious anticipation of receiving the Matewan Church's money. Upon execution, the originals of the "3–B" contracts were

sent, along with the check, to Sell America in Alabama. The "gold" carbon copy of each executed contract was given to Reverend Shinn who took them home to Dublin, Virginia.

The "3–B" contracts that were exchanged for the Matewan Church's check were simply the instruments that evidenced and embodied the pyramid scheme. The "3–B" contract does little to explain the substance of the transaction. However, the "3–B" contract does provide for the exchange of money for gold contracts and purports to provide some protection for the purchaser by allowing a refund within three days. The contract states that "[w]hile commissions are paid for the sale of only four Purchase Agreements ... it may not be easy for you to locate four purchasers." (Govt.Ex. No. 2C) Additionally, each purchaser was required to state that "I am responsible for making my own sales and I have not been promised that others will make the sales for me in order to earn any commission." (Govt.Ex. No. 2C).

The Matewan Church authorized Reverend Shinn to sign the "3–B" contracts on the Church's behalf. Of the 370 contracts, 206 of them were signed on February 18, 1991 by either Reverend Shinn or one of the defendants acting under "power of attorney."[5] The remaining 164 were signed by the defendants on behalf of Shinn at a later date.

### Purpose to Be Served

The information alleged, and the jury found, that the defendants' purpose was a "conspiracy to enrich themselves by fraudulently inducing the Matewan Church to pay $199,800 into the 'pyramid' or 'Ponzi' scheme being operated and promoted by Sell America and Gold Eagle and in which the Defendants and several of their relatives were ... participants." (Information, p. 3). From the evidence, it was clearly the purpose of the Matewan Church to part with their money for investment in the Sell America scheme.

■ Although the Government alleged and proved that the purpose of the conspiracy was to sell a pyramid scheme to the Matewan

---

5. The power of attorney was prepared by defen-    dants.

Church, it argues, in opposition to the motion for acquittal, that the Court should be restricted to an examination of what Reverend Shinn and the defendants said at the February 18 meeting. As stated by the Assistant United States Attorney, "the security is as it was presented by Reverend Shinn and as the board members received it and understood it, that they were buying an investment in a company that bought and sold gold coins in bulk, sold those coins for a profit and the money would either be in those coins or in some separate account for which there was little to no risk and from which they would gain their profits." (Trial trans., vol. IV, pp. 121–22). That is, the Government contends that the Court should determine whether or not a security was sold by looking only to the oral representations. In fact, the Government simply argues that what was said was what was sold.

The Government looks to two sentences of Reverend Shinn's testimony regarding the meeting of February 18, 1996: "I presented to the board of trustees that night an investment opportunity with a company called Sell America. I informed the board of trustees that they dealt with gold-minted coins, not with mines or speculation." (Trial trans., vol. II, p. 176). After limiting the transaction to these two sentences, the Government relies on the Seventh Circuit's decision in *S.E.C. v. Lauer*, 52 F.3d 667 (7th Cir.1995) for the proposition that a bare-faced representation can serve as a security for purposes of the Act.

This proposition ignores the Supreme Court's mandate in *Marine Bank* to determine the underlying substance of a transaction from all the existing circumstances by analyzing the content of the instruments, the purposes to be served, and the factual setting as a whole. *Marine Bank*, 455 U.S. at 560 n. 11, 102 S.Ct. at 1225 n. 11; *see also S.E.C. v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). In any event, *Lauer* is inapposite. This Court is not faced with a barefaced misrepresentation.

In this case, what was said at the February 18 meeting did not describe the market characteristics of that which was being sold. Reverend Shinn's talk of a "no-risk invest-

ment" guaranteed to generate an extraordinary return is little more than evidence of fraud. Likewise, the talk of pies, pieces of pies, and rivers being enlarged by tributaries obscures, more than it reveals. This Court finds it impossible to conclude that a country pastor's extemporaneous sales sermon, preached on one occasion to one group, is the kind of thing that Congress intended to regulate as a security. The brochure, the Agreement, and the Gold Contracts reveal much more of the transaction than the vague, scattered and sometimes contradicted testimony of the attendees of the meeting.

The court **FINDS** that no reasonable juror could conclude that the substance of the transaction was anything other than the pyramid scheme described in the brochure, embodied in the "3–B" Gold Contracts, and referred to in the February 18 Agreement.

## II.

Having considered the content of the instrument in question, the factual setting as a whole, and the purposes intended to be served, the Court need only determine whether the Act's definition of "security" is so broad as to encompass the pyramid scheme sold in this case. Commerce, while not a fine art, is a most creative form of human endeavor. Attempts at securities regulation take this into account. Congress determined that it should define "security" with specificity *and* with sufficient generality to sweep within the ambit of the securities acts unusual and uncommon instruments. *See Marine Bank*, 455 U.S. at 556, 102 S.Ct. at 1223–24. An "investment contract" is one of those variable definitional generalities used to describe such securities. The government and the defendants agree that the issue in this case is whether the subject matter of the transaction between the Matewan Church and the defendants was an investment contract.

The definitive explication of an "investment contract" is set forth in *S.E.C. v. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In *Howey*, the United States Supreme Court looked to construction of the term under state "blue sky" laws existing before the federal securities laws and deter-

mined that "Congress was using a term the meaning of which had been crystallized by prior judicial interpretation." *Howey*, 328 U.S. at 298, 66 S.Ct. at 1103. Therefore the Court found it "reasonable to attach that meaning to the term as used by Congress...." *Id.* According to the Supreme Court in *Howey*, an investment contract is a transaction "whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of [others]." *Id.* at 298–99, 66 S.Ct. at 1103.[6] The Fourth Circuit applies the *Howey* test when determining whether an investment contract exists in a particular case. *See Allen v. Lloyd's of London*, 94 F.3d 923, 930 (4th Cir.1996).

Courts have had little trouble applying the first and third elements of the *Howey* test and those elements are clearly met here. However, courts have had more difficulty applying the second ("common enterprise") and fourth ("solely from the efforts of others") elements. In fact, the circuits are split as to the meaning and application of the common enterprise element of the *Howey* test[7] and have linguistic differences as to the "efforts of others" prong.[8] The schism is whether a horizontal relationship of one investor with a pool of investors is required,[9] or whether a strict or broad vertical relationship between the investor and a promoter will satisfy the common enterprise element of the *Howey* test.[10] The Fourth Circuit has not addressed the commonality issue.

Horizontal commonality has existed in every instance where the Supreme Court has found that a transaction involved an investment contract.[11] The question is whether any other form of commonality will do. The horizontal commonality test is much easier to apply and likely "restrict[s] qualifying investment contracts to transactions that closely resemble the conventional definition of a security." Maura K. Monaghan, Note, *An Uncommon State of Confusion: The Common Enterprise Element of Investment Contract Analysis*, 63 FORDHAM L.REV. 2135, 2155 (1995). The vertical test expands the boundaries of definitional inclusion and therefore is attractive to those who urge the broadest of constructions. The vertical approach is taken by two circuits in the leading cases involving pyramid schemes.

In *S.E.C. v. Glenn W. Turner Enterprises*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), the

---

**6.** Speculation that *Howey* was no longer viable was put to rest in 1990 when the Supreme Court stated that, although it "reject[s] the approaches of those courts that have applied the *Howey* test to notes; *Howey* provides a mechanism for determining whether an instrument is an 'investment contract.'" *Reves v. Ernst & Young*, 494 U.S. 56, 64, 110 S.Ct. 945, 951, 108 L.Ed.2d 47 (1990).

**7.** *See Mordaunt v. Incomco*, 469 U.S. 1115, 105 S.Ct. 801, 83 L.Ed.2d 793 (1985) (White, J., joined by Chief Justice and Brennan, J., dissenting from denial of certiorari) (recognizing circuit court split regarding common enterprise element of the *Howey* test).

**8.** *See e.g. Bailey v. J.W.K. Properties, Inc.*, 904 F.2d 918, 920, 921 (4th Cir.1990) (stating that the "solely from the efforts of [others]" prong requires that the "most essential functions or duties must be performed by others and not the investor"); *S.E.C. v. Glenn W. Turner Enters.*, 474 F.2d 476, 482 (9th Cir.) (adopting a "realistic test" of the "solely from the efforts of [others]" prong of the *Howey* test that asks "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise"), *cert. denied*, 414 U.S.

821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); *S.E.C. v. International Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C.Cir.1992) (interpreting the fourth prong of the *Howey* test to require that the efforts be "predominantly" made by others).

**9.** "Horizontal commonality" exists whenever "the fortunes of each investor in a pool of investors [are tied] to the success of the overall venture." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir.1994).

**10.** "Strict vertical commonality" exists whenever "the fortunes of the investors [are tied] to the *fortunes* of the promoter." *Id.* at 88 (emphasis added) (citing *Long v. Shultz Cattle Co.*, 881 F.2d 129, 140–41 (5th Cir.1989)). "Broad vertical commonality" exists whenever "the fortunes of the investor [are linked] only to the *efforts* of the promoter." *Id.* (emphasis added) (citing *Brodt v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir.1978)).

**11.** *See* Maura K. Monaghan, Note, *An Uncommon State of Confusion: The Common Enterprise Element of Investment Contract Analysis*, 63 FORDHAM L.REV. 2135, 2155 (1995) (noting that horizontal commonality is the only form of commonality that has received "implicit Supreme Court endorsement").

Ninth Circuit addressed whether a pyramid scheme structured to sell self-improvement courses was an investment contract. Glenn Turner Enterprises sold five different programs. The first four programs were named Adventure I, Adventure II, Adventure III and Adventure IV. These programs cost $300, $700, $3,000, and $5,000 respectively. The last program was the $1,000 Plan and was priced accordingly.

Under the first two plans, Adventure I and Adventure II, the purchaser simply exchanged money for written material, audio tapes, and the right to attend a course. All of these materials were aimed at self-improvement or motivation. The Ninth Circuit did not find that these two plans constituted a security.

In Adventure III, Adventure IV, and the $1,000 Plans, the purchaser received more than self improvement material. Under these plans, the purchaser bought the opportunity to sell these plans in addition to receiving the self improvement materials and courses. Depending upon the plan sold, purchasers could earn as much as $2,500.

The Ninth Circuit applied the *Howey* test to these contracts. The court first found that the transactions involved an investment of money with an expectation of profits. Next, the court found that the investment was in a common enterprise because "the fortunes of the investor [were] interwoven with and dependant upon the efforts and success of those seeking the investment or of third parties." *Glenn Turner*, 474 F.2d at 482 n. 7. This is the vertical commonality approach.[12]

In *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir.1974), the Fifth Circuit addressed whether another multi-level marketing scheme was an investment contract. An investor could make money in two ways under the program: first, the investor could earn commissions on cosmetics sales; second,

investors could earn profits by inducing others to purchase distributorships.

Distributors were not required to actually sell the plan to new investors. Distributors merely had to find warm bodies that were willing to attend "Opportunity Meetings." At the meetings, Koscot Employees conducted the meetings and sold potential investors on the virtues of the Koscot plan. The meetings were well organized and ran according to a script.

The Commission did not contend that the portion of the plan whereby persons sold cosmetics was a security under section 2(1). Instead, it argued that the portion of the plan that provided for profits on distributorship was an investment contract. The Fifth Circuit found that the plan could be separated so that a determination could be made as to whether any component qualified as a security under the Act.

The Fifth Circuit analyzed the distributorship portion of the Koscot plan under the *Howey* test and first determined that there was an investment of money with an expectation of profits. Next, the court found that the investment was in a common enterprise. The court counseled that "[t]he critical factor is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts." *Koscot*, 497 F.2d at 478. "In Koscot there were numerous investors, but each investor's return was independent of the others. Nevertheless, the requisite commonality was evidenced by the fact that the fortuity of each investor was joined by the promoter and dependant on its efforts and expertise. This reasoning highlights the importance of the 'vertical' relationship between the investor and promoter in inquiries concerning the existence of a common enterprise." *First Nat'l Bank and Trust Co. of Oklahoma City v. Thoele*, 1982 WL 1344, *2 (W.D.Okla.1982).

---

12. A commentator has noted that the Ninth Circuit applied the broad vertical commonality standard in *Glenn Turner*. Larry D. Soderquist, *Reach of Securities Act Regulation, in* UNDERSTANDING SECURITIES LAWS 1996, at 358 (PLI Corp. Law & Practice Course Handbook Series, 1996). The Ninth Circuit now requires strict vertical commonality. *See Mordaunt v. Incomco*, 469 U.S. 1115, 105 S.Ct. 801, 83 L.Ed.2d 793 (1985) (White, J., joined by Chief Justice and Brennan, J., dissenting from denial of certiorari) (citing *Meyer v. Thomas & McKinnon Auchincloss Kohlmeyer, Inc.*, 686 F.2d 818 (9th Cir.1982)).

■ In this case, the pyramid scheme sold to the Matewan Church was structured so that when an investor made a sale, the profits were split between the investor and Sell America. While the fortunes of the investor were tied to the promoter, they were not tied to the fortunes of other investors—this pyramid scheme had strict vertical commonality but not horizontal commonality. Therefore, the question is whether vertical commonality, as it exists in this case, satisfies the common enterprise element of the *Howey* test. A contextual reading of the *Howey* test, informed by this Court's understanding of *Marine Bank v. Weaver*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982),[13] compels the following conclusion: a common enterprise exists only when the transaction contemplates a multiplicity of investors contemporaneously holding equipotential interests in the enterprise. This standard requires and encompasses transactions with horizontal commonality. It follows, and the Court **FINDS**, that the pyramid scheme in this case does not include an investment in a "common enterprise" as required by *Howey*.

Even if the Sell America scheme involved investment of money in a common enterprise, the scheme sold to the Matewan Church would not qualify as an investment contract because the fourth *Howey* prong is not met. The fourth prong of the *Howey* test requires that the investor expect to earn profits "solely from the efforts of others".[14] The Fourth Circuit interprets this requirement to mean that the "most essential functions or duties must be performed by others and not the investor." *Bailey v. J.W.K. Properties, Inc.*, 904 F.2d 918, 920 (4th Cir.1990). The "3–B" gold contracts scheme sold in this case required significant and substantial efforts from the investor.[15] In fact, the promoter's

---

**13.** Opinion is divided on whether *Marine Bank* suggests the requirement of horizontal commonality. *See First Nat'l Bank and Trust Co. of Oklahoma City v. Thoele*, 1982 WL 1344 (W.D.Okla.1982) (finding that *Marine Bank* requires horizontal commonality in order to satisfy common enterprise element); David Z. Nirenberg, *International Loan Syndications: The Next Security*, 23 Colum.J.Transnat'l L. 155, 166 n. 53 (1984) (noting that *Marine Bank's* holding "seems to support the view of requiring horizontal commonality"); Robert C. Art, *Sell a Condominium, Buy a Securities Lawsuit: Unwarranted Liabilities in the Secondary Market*, 53 Ohio St. L.J. 413, 422 n. 33 (1992) (stating that *Marine Bank* "lent some support to the view that the more stringent horizontal commonality [test] is necessary"); Michael J. Garrison & Terry W. Knoepfle, *Limited Liability Company Interests as Securities: A Proposed Framework for Analysis*, 33 Am.Bus.L.J. 577, 605–06 (1996) (acknowledging that one theoretical basis for *Marine Bank's* holding was that pooling was required to satisfy the common enterprise element of *Howey*); *but see Long v. Shultz Cattle Co.*, 881 F.2d 129, 140 n. 11 (5th Cir.1989) (noting the circuits' disagreement regarding the common enterprise element and stating that "the dissent from denial of certiorari in *Mordaunt* ... indicates that the Court considers the question to be an open one"); *Dooner v. NMI Ltd.*, 725 F.Supp. 153, 159 n. 5 (S.D.N.Y.1989) (stating that the Supreme Court has recognized that *Marine Bank* "did not establish horizontal commonality as the sole measure to determine the common enterprise element of the investment contract test"); Marc. I. Steinberg & William E. Kaulbach, *The Supreme Court and the Definition of 'Security': The 'Context' Clause, 'Investment Contract' Analysis,*

*and their Ramifications*, 40 Vand.L.Rev. 489, 519, 520 (noting that although "at first blush, [the *Marine Bank* Court] seems to have held implicitly that 'horizontal' commonality, and not 'vertical' commonality, is required to satisfy the *Howey* test's common enterprise element," nonetheless, "the requisite commonality to satisfy *Howey's* common enterprise element appears to remain an open question").

**14.** Every Circuit that has addressed the "solely from the efforts of others" prong of the *Howey* test has interpreted it broadly. *See e.g., S.E.C. v. Aqua–Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir.), *cert. denied*, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982); *Goodwin v. Elkins & Co.*, 730 F.2d 99, 103 (3d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 61 (1984); *Bailey v. J.W.K. Properties, Inc.*, 904 F.2d 918, 920, 921 (4th Cir.1990); *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *S.E.C. v. Professional Assocs.*, 731 F.2d 349, 357 (6th Cir. 1984); *Kim v. Cochenour*, 687 F.2d 210, 213 n. 7 (7th Cir.1982); *Fargo Partners v. Dain Corp.*, 540 F.2d 912, 914–15 (8th Cir.1976); *Glenn Turner*, 474 F.2d at 482 (9th Cir.); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1040 n. 3 (10th Cir.1980); *Baurer v. Planning Group Inc.*, 669 F.2d 770, 779 (D.C.Cir.1981). As stated in *Koscot*, a strict interpretation of the efforts requirement would allow any promoter to avoid the protections of the act by merely requiring a modicum of effort on the part of the investor. *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 480 (5th Cir.1974).

**15.** Unlike the situation in *Glenn Turner* and *Koscot*, Sell America does not make a presentation.

only effort was to provide forms and pamphlets and to skim the profits. The most essential "functions and duties" were the sales efforts to be performed by the investor.

The Court **FINDS** that the transaction at issue in this case did not involve a security. Accordingly, the Court **GRANTS** the motions of defendants Holtzclaw, Horn, Estes, and Morfey for judgment of acquittal of the securities fraud crimes charged in the Information—Criminal No. 3:96–00022. The Court **DIRECTS** the Clerk to enter judgment on the record.

An Order addressing defendants' remaining motions will be filed contemporaneously with this Opinion and Order.

The Court **DIRECTS** the Clerk to send a copy of this Opinion and Order to all defendants and their counsel, the United States Attorney, United States Probation Office, the United States Marshall.

*See Glenn Turner,* 474 F.2d at 482 (1973) (noting that sales "efforts are the *sine qua non* of the scheme" and that those sales efforts were not made by the investor); *Koscot,* 497 F.2d 473 (noting that the sales meetings were the most important element of the scheme and that those meetings ran "according to a preordained script, the deviation from which would occasion disapprobation"). In Sell–America's "3–B" program all of the essential efforts are performed by the investors themselves. Indeed, as described in the brochure, the earnings under the "Unitary Marketing Plan" "are based solely upon your own efforts and abilities." (Govt.Ex. No. 9B).